INTERNATIONAL BOXING CLUB OF NEW YORK, INC., ET AL. *v.* UNITED STATES.

No. 18.   Argued November 13, 1958.—Decided January 12, 1959.

*Kenneth C. Royall* argued the cause for appellants. On the brief were *Mr. Royall* and *John F. Caskey* for the Madison Square Garden Corporation et al., and *Charles Sawyer* for the International Boxing Club, Inc., of Illinois, et al.

*Philip Elman* argued the cause for the United States. On the brief were *Solicitor General Rankin, Assistant Attorney General Hansen* and *Charles H. Weston.*

Mr. Justice Clark delivered the opinion of the Court.

This civil Sherman Act [1] case was here four years ago on direct appeal from a dismissal by the District Court, which had held that the Act did not apply to the business of professional boxing. We reversed, finding that "the complaint states a cause of action [under the Act] and that the Government is entitled to an opportunity to prove its allegations," and remanded the case for trial on the merits. *United States* v. *International Boxing Club,* 348 U. S. 236 (1955). The complaint charged the appellants with a combination and conspiracy in unreasonable restraint of trade and commerce among the States in the promotion, broadcasting, and televising of professional world championship boxing contests, as well as a conspiracy to monopolize and monopolization of the same. After a trial, the District Court, in an opinion incorporating detailed findings of fact and conclusions of law based on the principles laid down in our earlier opinion, found that the allegations of the complaint had been sustained. 150 F. Supp. 397. After further hearings on the nature and extent of the relief necessary to protect the public interest, the court entered its final judgment dissolving two of the corporate appellants, directing divestiture of certain stock owned by the individual appellants and granting injunctive relief designed to open up the market in the business of promoting professional world championship boxing matches.

The appellants, while not attacking any specific finding as clearly erroneous, claim that the proof did not show that they violated either Section 1 or 2 of the Act. In this regard appellants level their strongest blows at the District Court's definition of the relevant market. Out of the entire field of professional boxing, the District Court carved a market in championship contests alone, hold-

[1] 15 U. S. C. § 1 *et seq.*

ing it to be the relevant market at which the conspiracy was aimed. In the alternative, appellants insist that the relief granted the Government was "unnecessarily punitive," even if liability is assumed. On a direct appeal to this Court we noted probable jurisdiction, 356 U. S. 910 (1958). We have concluded that the findings of the District Court are not clearly erroneous and that in view of our former holding on the sufficiency of the complaint the judgment on the merits was properly entered. As to the relief granted we find that the court did not exceed the limits of allowable discretion in framing a decree "that will, so far as practicable, cure the ill effects of the illegal conduct, and assure the public freedom from its continuance." *United States* v. *United States Gypsum Co.,* 340 U. S. 76, 88 (1950).

Our previous decision herein having decided that the promotion of professional championship boxing contests on an interstate basis constituted trade and commerce among the States, within the meaning of the Sherman Act, there is no contest here either on the findings or the law on that point. Since on that appeal we discussed in some detail the allegations of the complaint, which the trial court has now found amply proven by the evidence, we shall only summarize the findings here.

## The Findings.

The conspiracy began in January 1949, when appellants Norris and Wirtz, who owned and controlled the Chicago Stadium, the Detroit Olympia Arena and the St. Louis Arena, made an agreement with Joe Louis, the then heavyweight boxing champion of the world. Wishing to retire, Louis agreed to give up his title after obtaining from each of the four leading contenders [2] exclusive promotion rights including rights to radio, television and

---

[2] Ezzard Charles, Joe Walcott, Lee Savold, and Gus Lesnevich.

movie revenues. Upon securing these exclusive contracts Louis assigned them to the appellant International Boxing Club, Illinois, which was organized by Norris and Wirtz for the purpose of promoting boxing for the combination in Illinois. They paid Louis $150,000 cash plus an employment contract and a 20% stock interest in I. B. C., Illinois.

In March 1949 Norris and Wirtz approached appellant Madison Square Garden, in which they had for many years owned 50,000 shares of stock. It was the "foremost sports arena in New York City and is the best known arena of its kind in the United States, if not the world." [3] However, its facilities were tied up by an exclusive lease it had granted to Mike Jacobs' interests—the leading professional boxing promoter in the field at that time. Norris and Wirtz proposed that they should all "work together now and keep the events for our buildings and not create a competitive situation that would be harmful to all." In order to effectuate this program, appellant Madison Square Garden bought out Mike Jacobs' interests, including, in addition to his lease on Madison Square Garden, his exclusive leases to Yankee Stadium and the St. Nicholas Arena and his contract with the then welterweight champion Sugar Ray Robinson. These contracts were assigned to International Boxing Club, New York, organized for the purpose of promoting boxing for the combination in New York.

Once Jacobs' interests had been acquired, there remained only one substantial competitor in the field of

---

[3] The importance of Madison Square Garden in the present context is shown by the fact that of all the championship contests staged during the 12 years immediately preceding 1949, 45% were held in New York City, of which 75% were in Madison Square Garden. The balance of the New York championship bouts, with one exception, were held in Yankee Stadium, the Polo Grounds, or St. Nicholas Arena.

promoting championship boxing matches. That was Tournament of Champions, Inc., owned in part by the Columbia Broadcasting System. It owned an exclusive lease on the Polo Grounds as well as an exclusive promotion contract covering the next two fights of the then middleweight champion of the world. In May 1949 Madison Square Garden bought all of the stock of Tournament of Champions at a cost of $100,000 plus 25% of the net profits on the next two middleweight championship matches. The assets thus acquired were likewise assigned to I. B. C., New York. By a simultaneous separate agreement, Columbia Broadcasting System agreed for a five-year period not to invest in or promote any professional boxing matches in return for a first refusal right to the broadcasting of certain boxing matches staged for a like period in Madison Square Garden.

This series of agreements, consummated within four months' time, gave appellants exclusive control of the promotion of boxing matches in three championship divisions, i. e., heavyweight, middleweight, and welterweight. Not satisfied with this temporary control, however, appellants perpetuated their hold on championship bouts by requiring each contender for the title to grant to them an exclusive promotion contract to his championship fights, including film and broadcasting, for a period of from three to five years. Over the facilities for the staging of contests appellants exercised like control, owning or managing the "key" arenas and stadia in the Nation.[4]

Tightening the ropes around the ring thus built, Norris and Wirtz increased their stockholdings in Madison Square Garden to where they controlled it and were able

---

[4] Between 1937 and 1948, 50% of all championship contests were staged in either Madison Square Garden, Yankee Stadium, the Polo Grounds, St. Nicholas Arena, Chicago Stadium, Detroit Olympia Arena, or the St. Louis Arena.

to "dictate its policies and boxing activities." This has continued their control over I. B. C., New York, the stock of which is now wholly owned by Madison Square Garden.[5] They are the sole stockholders of Chicago Stadium Corporation which in turn is the sole stockholder of I. B. C., Illinois. Their control over this boxing empire is revealed by the fact that Norris is president of each of the four top corporations, i. e., Madison Square Garden, I. B. C., New York, Chicago Stadium Corporation, and I. B. C., Illinois. He and Wirtz are directors in all four, while I. B. C., Illinois and I. B. C., New York, which have owned all of the promotion contracts with the contenders, have a joint board of directors.

The effect of the conspiracy is obvious. Using the facilities of I. B. C., Illinois, and I. B. C., New York, appellants entered into exclusive promotion contracts with title aspirants, requiring exclusive handling agreements in the event the contender became champion. In amassing their empire, appellants obtained control of champions in three divisions. The choice given a contender thereafter was clear, i. e., to sign with appellants or not to fight. With appellants in control of the key arenas and stadia of the country through Madison Square Garden, Chicago Stadium Corporation, and others, an event could not be successfully staged in any of these areas, the most fruitful in the Nation, without their

---

[5] At the time the I. B. C.'s were formed, Joe Louis owned 20% of the stock of each and the other 80% was split evenly between Norris and Wirtz on one hand and Madison Square Garden on the other. At some point thereafter, Louis ceased to be a stockholder and his share was split evenly between Norris-Wirtz and Madison Square Garden. At the time of the final decree, apparently as the result of an effort to make a showing of separateness of control, the Norris-Wirtz interests owned all of the stock in I. B. C., Illinois, and Madison Square Garden owned all of the stock in I. B. C., New York. The trial court found that the two interests nevertheless still shared equally in the combined profits of both I. B. C.'s.

consent. The exercise of this power brought immediate results. From June 1949, when appellants staged their first championship fight, until May 15, 1953, the date of the amended complaint, they staged or controlled the promotion of 36 of the 44 championship battles held in this country, giving them approximately 81% of that field. In two of the classifications, heavyweight and middleweight, the combine staged all of the contests. The power of the combine to exclude competitors in the championship field is graphically shown by their promotion of 25 out of 27 fights in all divisions, a total of 93%, during the two-and-a-half-year period ending with the filing of the amended complaint. This power extended to the sale of film and broadcasting rights—most valuable adjuncts to successful promotion in the business.

Appellants launch a vigorous attack on the finding that the relevant market was the promotion of *championship* boxing contests in contrast to *all* professional boxing events. They rely primarily on *United States* v. *du Pont & Co.*, 351 U. S. 377 (1956). That case, involving an alleged monopoly of the market in cellophane, held that the relevant market was not cellophane alone but the entire field of flexible packaging materials. In testing for the relevant market in Sherman Act cases, the Court said:

> ". . . no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that 'part of the trade or commerce,' monopolization of which may be illegal." *Du Pont, supra,* at 395.

The appellants argue that the "physical identity of the products here would seem necessarily to put them in one and the same market." They say that any boxing contest, whether championship or not, always includes one ring, two boxers and one referee, fighting under the same rules before a greater or lesser number of spectators

either present at ringside or through the facilities of television, radio, or moving pictures.

We do not feel that this conclusion follows. As was also said in *du Pont, supra,* at 404:

> "The 'market' . . . will vary with the part of commerce under consideration. The tests are constant. That market is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered."

With this in mind, the lower court in the instant case found that there exists a "separate, identifiable market" for championship boxing contests. This general finding is supported by detailed findings to the effect that the average revenue from all sources for appellants' championship bouts was $154,000, compared to $40,000 for their nonchampionship programs; that television rights to one championship fight brought $100,000, in contrast to $45,000 for a nontitle fight seven months later between the same two fighters; that the average "Nielsen" ratings [6] over a two-and-one-half-year period were 74.9% for appellants' championship contests, and 57.7% for their nonchampionship programs (reflecting a difference of several million viewers between the two types of fights); that although the revenues from movie rights for six of appellants' championship bouts totaled over $600,000, no full-length motion picture rights were sold for a nonchampionship contest; and that spectators pay "substantially more" for tickets to championship fights than for

---

[6] According to the District Court, the "Nielsen Average Audience rating is a percentage which purports to show the number of residential television sets that were tuned in to the program expressed as a percentage of the total residential television sets, whether turned off or on, which were in areas into which the program was telecast."

nontitle fights. In addition, numerous representatives of the broadcasting, motion picture and advertising industries testified to the general effect that a "particular and special demand exists among radio broadcasting and telecasting [and motion picture] companies for the rights to broadcast and telecast [and make and distribute films of] championship contests in contradistinction to similar rights to non-championship contests." [7]

In view of these findings, we cannot say that the lower court was "clearly erroneous" in concluding that nonchampionship fights are not "reasonably interchangeable for the same purpose" as championship contests. A determination of the "part of the trade or commerce" encompassed by the Sherman Act involves distinctions in degree as well as distinctions in kind. One prime example of this is the application of the Act to trade or commerce in a localized geographical area. See, *e. g., Schine Theatres* v. *United States,* 334 U. S. 110 (1948); *United States* v. *Griffith,* 334 U. S. 100 (1948); cf. *Times-Picayune* v. *United States,* 345 U. S. 594 (1953); *United States* v. *Columbia Steel Co.,* 334 U. S. 495 (1948). The case which most squarely governs this case is *United States* v. *Paramount Pictures,* 334 U. S. 131 (1948). There, the charge involved, *inter alia,* extensive motion picture theatre holdings. The District Court had refused to order a divestiture of such holdings on the grounds that no "national monopoly" had been intended or obtained. This Court felt that such a finding was not dispositive of the issue, saying:

"First, there is no finding as to the presence or absence of monopoly on the part of the five majors

---

[7] Approximately 25% of the revenue produced by the appellants' championship fights during the period covered by the complaint was derived through the sale of radio, television and motion picture rights.

[defendants] in the *first-run* field for the entire country, in the *first-run* field in the 92 largest cities of the country, or in the *first-run* field in separate localities. Yet the *first-run* field, which constitutes the cream of the exhibition business, is the core of the present cases. Section 1 of the Sherman Act outlaws unreasonable restraints irrespective of the amount of trade or commerce involved (*United States* v. *Socony-Vacuum Oil Co.*, 310 U. S. 150, 224, 225, n. 59), and § 2 condemns monopoly of 'any part' of trade or commerce." *Paramount, supra,* at 172–173. (Emphasis in the original.)

Similarly, championship boxing is the "cream" of the boxing business, and, as has been shown above, is a sufficiently separate part of the trade or commerce to constitute the relevant market for Sherman Act purposes.[8]

We have also examined the remainder of this characteristically lengthy record. When the case was here previously appellants did not deny that the allegations of the complaint stated a cause of action against them, provided their activity came within the meaning of the Sherman Act. We held that the complaint stated a cause of action. The District Court has now found these allegations to have been proven. With the case in this posture, appellants have an almost insurmountable burden. They must show that the findings, or at least the basic ones, are "clearly erroneous." Rule 52 (a), Rules of Civil Procedure. This they have not been able to do. It follows that the decree entered on the merits adjudging the appellants to have violated both §§ 1 and 2 of the Sherman Act must be affirmed.

---

[8] By analogy, it bears those sufficiently "peculiar characteristics" found in automobile fabrics and finishes such as to bring them within the Clayton Act's "line of commerce." *United States* v. *du Pont & Co.*, 353 U. S. 586, 593–595 (1957).

## The Relief.

In approaching the question of relief we must remember that our function is not to sit as a trial court. *Besser Mfg. Co.* v. *United States,* 343 U. S. 444, 449–450 (1952); *United States* v. *National Lead Co.,* 332 U. S. 319 (1947); cf. *United States* v. *Crescent Amusement Co.,* 323 U. S. 173, 185 (1944). As was said in *International Salt Co.* v. *United States,* 332 U. S. 392, 400–401 (1947):

> "The framing of [antitrust] decrees should take place in the District rather than in Appellate Courts. They are invested with large discretion to model their judgments to fit the exigencies of the particular case."

The yardstick which the trial court should apply in monopolization cases is well stated by the Court in *Schine Theatres* v. *United States,* 334 U. S. 110, 128–129 (1948). The decree should (1) put "an end to the combination or conspiracy when that is itself the violation"; (2) deprive "the antitrust defendants of the benefits of their conspiracy"; and (3) "break up or render impotent the monopoly power which violates the Act."

The relief granted by a trial court in an antitrust case and brought here on direct appeal, thus by-passing the usual appellate review, has always had the most careful scrutiny of this Court. Though the records are usually most voluminous and their review exceedingly burdensome, we have painstakingly undertaken it to make certain that justice has been done. See, *e. g., United States* v. *Paramount Pictures, supra; Schine Theatres* v. *United States, supra; United States* v. *National Lead Co., supra.* That we have done here. We have finally concluded that the relief granted was not beyond the allowable discretion of the District Court.

*The Bounds of the Relief Ordered.*

At the time of the final decree the Joe Louis agreements had elapsed; the exclusive-contract practice had been at least temporarily abandoned; the leases on Yankee Stadium, the Polo Grounds and St. Nicholas Arena in New York had been given up and the appellants had no control over the new heavyweight champion, Floyd Patterson. Nevertheless, the additional evidence taken by the District Court showed that they still possessed all of the power of monopoly and restraint. In this we agree. The appellants had exercised a strangle hold on the industry for a long period. It was evident at the time of the decree that, statistically, they still dominated the staging of championship bouts and completely controlled the filming and broadcasting of those contests. They had gained this leadership through the elimination by purchase of all of their major competitors in the field; by the control of contending boxers through exclusive agreements; and by the staging of events through the ownership or lease of key stadia and arenas. This illegal activity gave appellants an odorous monopoly background which was known and still feared in the boxing world. In addition, Norris and Wirtz still possessed the major tools, so well used previously, necessary to continue their control. They owned or controlled the key arena and stadium in New York and Chicago, the most lucrative communities in boxing; they continued to control all of the championship bouts staged there; they commanded the filming and broadcasting of all championship fights— the cream of the business—wherever staged; and though on the surface they owned no stock directly in the two I. B. C. corporations, each was the wholly owned subsidiary of corporations which Norris and Wirtz did control and manage.

In this setting the District Court ordered Norris and Wirtz to divest themselves, within a five-year period, of

all stock which they owned "directly or indirectly" in Madison Square Garden. In addition, both of the International Boxing Clubs, Illinois and New York, were ordered dissolved. The Chicago Stadium and Madison Square Garden were each enjoined from staging more than two championship bouts annually. All exclusive agreements for the promotion of boxing events, including nonchampionship, were banned. Madison Square Garden was ordered for a period of five years to lease its premises when available at a "fair and reasonable" rental to any duly qualified promoter applying in writing therefor. Failure to agree on terms would require submission to the courts for determination. Like requirement was imposed on Chicago Stadium Corporation, provided Norris-and-Wirtz control continued.

The District Judge concluded that it was necessary to include each of these provisions in the decree in order to put an end to the combination, deprive the appellants of the benefit of their conspiracy and break up their monopoly power. At the conclusion of the final hearing on relief he observed that prior to 1949 the Norris-Wirtz group was in Chicago while the Madison Square Garden enterprise was in New York. They were "two separate entities," one promoting contests in the mid-West and the other in New York. He declared that "in order to destroy this monopoly we have to return the situation as nearly as possible to the economic conditions as they existed in 1949" and, further, "I can see no way in this case . . . that a proper decree can be formulated unless that power that Wirtz and Norris have in Madison Square Garden is curtailed. They have to get out of the control."

*The Order of Divestiture.*

Appellants contend that since the stock owned by Norris and Wirtz was not acquired pursuant to the conspiracy, was not the fruit of illegal activity and was not

proven to be the lever by which Madison Square Garden was persuaded to join the conspiracy, divestiture was but punishment rather than a necessary corrective remedy. They further say that the sale, even though made in the manner outlined in the decree,[9] would result in great loss to Norris and Wirtz. They contend that it was arbitrary for the District Court not to permit them to exercise an option, as proposed by them, of a choice between Madison Square Garden and the Chicago Stadium, both of which they still control.

It may be that the stock in Madison Square Garden was not the fruit of the conspiracy; but even if lawfully acquired it may be utilized as part of the conspiracy to effect its ends. See *United States* v. *Paramount Pictures, supra,* at 152. Moreover, since the inception of the conspiracy Norris and Wirtz have increased their holdings to over 219,000 shares. It was this stock ownership and their control of stock voting power that the trial court found dictated the election of the officers and directors of Madison Square Garden and gave to Norris and Wirtz the unquestioned control and management of its activities. Although reluctant at first to require a divestiture of this stock, the trial judge ultimately became convinced that it was the *sine qua non* of the relief. During the hearing he said:

"The great evil I found was the combination that Wirtz and Norris caused and created by joining up with Madison Square Garden. I regard Wirtz and Norris as one and Madison Square Garden as another, a separate entity and business interest. *The evil*

---

[9] Norris and Wirtz were given five years to sell their stock in Madison Square Garden, which stock is listed on the New York Stock Exchange. During this time, the stock is to be held by two trustees named by the court. If the stock is not sold within five years, the trustees are ordered to sell it within the next two years.

*primarily sprung from their combination, their con-*
*certed efforts and action.   That has to be broken up."*
(Emphasis supplied.)

What is perhaps equally significant is that through the
exercise of this power Norris and Wirtz elected the officers
and board of directors of I. B. C., New York—a joint
board with I. B. C., Illinois, which they also controlled
through the Chicago Stadium Corporation.   This joint
board was the bridge over which the conspiracy was made
effective.   Over it the control of the promotion of cham-
pionship boxing contests was secured.   That this control
remained effective up to the very date of the final hearing,
June 24, 1957, is shown by the following statement by
the court on that date:

"The unlawful combination of the defendants still
possesses and exercises its monopolistic control in
the field of championship contests.   It appears that
since May 15, 1953 there have been held in the United
States 37 championship contests, excluding one ban-
tamweight contest.   The defendants admit that they
had promotional control over 24 of the 37 champion-
ship contests which were held or of 65 per cent of
the market, but we find that the defendants were not
financial strangers to the other 13 championship con-
tests which were held in cities other than New York
and Chicago.   Because the defendants are licensed
by state authorities to promote only in New York and
Illinois, they could not be the persons actually des-
ignated as the promoter of the 13 championship con-
tests, but all five of the championship contests which
originated in cities other than Chicago or New York
on Friday nights were televised on IBC's-New York
Friday night television series.

"We find, too, that all of the 37 championship
contests in this period from May 15, 1953, save

only the five outdoor contests, were televised on either the defendants' Wednesday or Friday night television series, and that the profits of the sale of the telecasting rights inured to the benefit of the defendants."

As this was some two and a half years after our opinion in the former appeal on January 31, 1955, it appears that appellants had continued exercising their unlawful control long after they well knew that this activity was within the coverage of the Sherman Act. In view of the fact that no denial was made on that appeal of the sufficiency of the Government's complaint it is reasonable to assume that appellants, subsequent to our opinion, knew that their conduct violated the Sherman Act, obedience to which is so important to our free enterprise system. Still they continued their illegal activity. In fact from all appearances it is continuing to this day. Such conduct, in addition to the interlocking nature of the ownership at the time of the final decree, fully justified the District Court's conclusion that the "dissolution of the combination can only be accomplished by an immediate and complete severance of the interlocking ownership of Norris and Wirtz in Madison Square Garden. . . . [T]here must be a complete divestiture of the stockholdings of Norris and Wirtz in the Garden. The Government has established Norris and Wirtz control the Garden Corporation." Moreover, this was the only effective means at hand by which competition in championship events might be restored. It was intended to return the parties as near as possible to the *status quo* existing prior to the conspiracy.

For these reasons, we do not see why it was incumbent upon the court to give Norris and Wirtz certain options requested at the time of the decree. We shall mention only two. The first was that they have the right to exercise a choice of retaining either Madison Square Gar-

den or the Chicago Stadium. But this would not be conducive to the re-establishment of competition *between* the two interests, which the District Court considered a necessity. Nor would it eliminate the "great evil" the trial court found in the Norris-Wirtz-Garden combination. Another requested option was that Norris and Wirtz be permitted to retain their control of Madison Square Garden and the latter be enjoined from promoting championship boxing events. But this would have eliminated the world's principal boxing center—"the premier sports arena in the world," as appellants characterized it—from promoting such events in competition with Norris and Wirtz.

In short, the Government in its effort to free the professional boxing business of monopoly and unreasonable restraints would have won the battle but lost the war under either of the proffered alternatives. As this Court said in *United States* v. *Crescent Amusement Co.,* 323 U. S. 173, 189–190 (1944):

> "Common control was one of the instruments in bringing about unity of purpose and unity of action and in making the conspiracy effective. If that affiliation continues, there will be tempting opportunity . . . to act in combination . . . . The proclivity in the past to use that affiliation for an unlawful end warrants effective assurance that no such opportunity will be available in the future."

*The Dissolution of the Two International Boxing Clubs.*

Admittedly these corporations were formed pursuant to and were the means used to effectuate the conspiracy. As the trial judge said:

> "These corporations are the promotional arms of the defendants, conceived and used to enable defendants

to restrain and monopolize promotion of championship boxing contests. Their assets are of but nominal value except for the goodwill attaching to their names by virtue of the conspiracy."

The conditions existing here even subsequent to our former opinion confirm the need for such dissolution. Both corporations continued to share equally the profits the combination reaped from the staging of championship boxing contests. This also included revenues from championship contests promoted by others but televised by the combination. They continue even now as the bridge between the choice arenas Norris and Wirtz own or control and the boxers with whom they have exclusive promotion contracts. Through interlocking officers and directorates the two I. B. C.'s thus effectively hold the combination together. It is antitrust policy to decree dissolution "where the creation of the combination is itself the violation." *United States* v. *Crescent Amusement Co., supra,* at 189, and cases there cited. This is one of those situations where the injunctive process affords too little relief too late.

Appellants argue that this is punitive; that the parent companies, under the decree, are left free to organize new corporations to handle their respective boxing promotions and, hence, dissolution is a useless act. The trial court felt, however, and we agree, that continued operation under the old I. B. C. charters might lead to a situation *nominis umbra* not conducive to the elimination of the old illegal practices. New corporations, if formed, would start off with clean slates free from numerous written and oral agreements and understandings now existent and known throughout the industry. Hence dissolution might well have the salutary effect of completely clearing new horizons that the trial judge was attempting to create in the boxing world, especially when effected in conjunc-

tion with the stock divestiture provision. Moreover, there would be little inconvenience and nominal expense even if, as appellants contend, they "as a practical matter must [form new corporations] if they are to promote any boxing at all." This we think a poor excuse for not completely eliminating, by dissolution, these old trappings of monopoly and restraint.

*The Compulsory Leasing Provisions.*

The District Court, having found that one of the means used in effectuating the conspiracy was the ownership and control of arenas and stadia, entered a compulsory leasing provision in the decree as to Madison Square Garden and the Chicago Stadium Corporation.[10]

The appellants' main concern with this provision of the decree is the requirement that in the event the terms of a lease cannot be agreed upon the matter will be submitted to the District Court. Appellants fear that this is not only an undesirable but an impractical activity for a District Court. But they have suggested no alternative to relieve the court of this burden. Obviously, such a provision may result in some disputes which must be settled. Until experience in the enforcement of the provision proves the reference to be too burdensome we see no reason to disturb it. If experience proves it unworkable the parties, under the decree, may apply to the court for

---

[10] This provision of the decree, applying only to championship contests, ordered appellants to lease their respective buildings upon seasonable written request by a qualified promoter, if the proposed rent is reasonable, if the applicant furnishes adequate security, and if at the time of the application the building is neither already under lease to another for the specified day nor in conflict at that time with "any well-established event" which has been regularly conducted therein. If the parties cannot agree on what constitutes adequate security or a reasonable rental, either party may apply to the court for a determination thereof.

appropriate relief. See *Lorain Journal Co.* v. *United States,* 342 U. S. 143, 156–157 (1951); *International Salt Co.* v. *United States, supra,* at 401.

*Exclusive Contracts With Contestants.*

Appellants object to the prohibition against exclusive contracts applying to all professional boxing contests. They question the Government's enlarging its base from championship bouts to all professional boxing. But human nature being what it is there is sound reason to say that exclusive contracts with boxers in nontitle contests would surely affect those same boxers when and if they arrive at the title. Such arrangements would give appellants, so experienced in the boxing field, a decided advantage over the independent promoter. Such a prohibition is fully justified at least until the effects of the conspiracy are fully dissipated. For the same reason we see no fault in the five-year prohibition against exclusive rights to a return bout.

The trial court recognized that these restrictions went beyond the "relevant market" which has been considered for purposes of determining the Sherman Act violations, but felt that "[t]he relief here must be broader than the championship field because the evil to be remedied is broader." This Court has recognized that sometimes "relief, to be effective, must go beyond the narrow limits of the proven violation." *United States* v. *United States Gypsum Co., supra,* 340 U. S., at p. 90; *Timken Co.* v. *United States,* 341 U. S. 593, 600 (1951). When this sort of relief is granted, we must of course be especially wary lest the trial court overstep the correspondingly narrower limits of its discretion, but, for the reasons set out above, we feel that no such misuse of the trial court's power is present here.

We have considered the other objections of appellants to the decree and find them unsubstantial as presently

posed. In the event experience proves that some of the provisions are so severe as to require modification or amendment, the parties may apply to the District Court as provided in paragraph 25 of the decree. The judgment should be affirmed.

*It is so ordered.*

MR. JUSTICE STEWART took no part in the consideration or decision of this case.

MR. JUSTICE FRANKFURTER, dissenting in part.

While I have heretofore expressed views in favor of the almost controlling deference to be paid to a District Court's considered formulation of the provisions appropriate to a decree designed to remedy adjudicated violations of the antitrust laws, those views have not prevailed, see the opinions in *United States* v. *Paramount Pictures,* 334 U. S. 131, and this Court has felt free to modify and eliminate provisions of an antitrust decree, particularly when a single judge has imposed an unconventional and drastic remedy. The main issue dealt with in MR. JUSTICE HARLAN's dissent, while a narrow one, is, in my view, important. While divestiture has been decreed by the district judge, the mandatory disposition of the stock has been delayed for five years, and the stock placed in trusteeship. During this five-year period a series of detailed controls have been imposed, under the supervision of the District Court, in order to prevent appellants Norris and Wirtz from exercising the power their stock ownership has given them over the operations of Madison Square Garden. The ownership itself has been sterilized. I think it not an unreasonable forecast that, even were we to postpone for five years the decision whether to order the divestiture or continue the trusteeship, appellants Norris and Wirtz would not find it profitable to continue their sterilized ownership of the Garden stock. How-

ever, there is no compelling reason to order them to do what sound business judgment may compel. One has the right to assume that, in view of this Court's unanimous affirmance of the findings below that appellants were in violation of the Sherman Law, they will scrupulously obey the decree and not even by the subtlest indirection seek to avoid our decision. Therefore I think it is needless now to determine that divestiture must take place five years hence, rather than wait upon the event in order to determine whether divestiture should then be ordered.

Accordingly, I join MR. JUSTICE HARLAN's opinion.

MR. JUSTICE HARLAN, whom MR. JUSTICE FRANKFURTER and MR. JUSTICE WHITTAKER join, dissenting in part.

I am unable to subscribe to the Court's approval of those parts of the decree below which ordered (1) the divestiture of the stockholdings of Norris and Wirtz in Madison Square Garden Corporation and (2) the dissolution of the New York and Illinois International Boxing Clubs. On the other aspects of the case I agree with the results the Court has reached.

### DIVESTITURE.

As a starting point I accept the conclusion of the District Court that competition in the promotion and exhibition of professional championship boxing could not be effectively restored so long as Norris and Wirtz remained in control of Madison Square Garden's activities in this field. Because of the pre-eminence of the Garden as a site for boxing contests, the District Court found that its control by Norris and Wirtz constituted the fulcrum of the antitrust violations which were adjudged. That finding is supported by the evidence, and in turn justifies the court's conclusion that the elimination of their

influence in the Garden was prerequisite to restoring competition.

It by no means follows, however, that the order divesting Norris and Wirtz of their Garden stockholdings was an appropriate method of accomplishing that objective in the circumstances of this case. Unless past pronouncements of this Court cautioning against the indiscriminate use of divestiture as a remedy in antitrust cases, see *Timken Co.* v. *United States*, 341 U. S. 593, are to be taken less seriously than they should be, it seems to me that the Court has too lightly given approval to the use of that drastic measure here.

*First.* It is not at all clear to me just why the District Court, which in the early stages of the hearings on relief expressed itself strongly against divestiture, ultimately reached the conclusion that such a course was necessary. Indeed the record can be read as indicating the court's belief that the five-year trusteeship of the stock, though designed to alleviate some of the hardships of a forced sale, would at the same time effectively remove Norris and Wirtz from control over the Garden's affairs and therefore in conjunction with the other provisions of the decree result in restoring competitive conditions, whether or not the correlative requirement of sale was carried out within the five-year period.[1] The decree itself supports this

---

[1] Apart from its divestiture and dissolution provisions, the decree imposes wide-ranging and pervasive restrictions on appellants' activities in boxing promotion and exhibition. It renders void all exclusive contracts which they may presently have with boxers. It prohibits the making of new exclusive contracts, with the exception that, after five years, exclusive provision may be made for return bouts. Similarly, exclusive leases with stadia not owned by appellants are proscribed. So, too, are such arrangements with television and radio broadcasters. Further, appellants are restrained, for a period of five years, from promoting more than four championship boxing programs annually, two by Madison Square Garden and two, cumulatively, by Norris and Wirtz. During that five-year period also, the com-

reading. For despite the evident realization that the stock might not be sold within five years, the provisions of the decree especially aimed at opening up competition for the use of the Garden are all geared to this period. If in fact the District Court thought this five-year insulation of Norris and Wirtz from managerial and policy-making activities at the Garden would combine with the other restrictions to restore competition, justification for divestiture must then be found in a purpose to prevent a relapse into noncompetitive conditions after the five years have elapsed, something which the District Court quite properly considered to be a function of the decree. On this premise I am at a loss to see why continuance of the trusteeship, and, if necessary, the concomitant restrictions on the Garden's activities, should not have been considered adequate to serve that end.

*Second.* If I am mistaken in thus divining the thinking of the District Court, I still consider that in the circumstances of this case divestiture was at least ordered prematurely. Determination whether that drastic remedy was required should have been postponed until the expiration of the trusteeship period so that the necessity for its application could then be judged in light of the effectiveness of the other sanctions of the decree. I recognize that various contingencies can be conjured up to support the view that divestiture, rather than trusteeship, holds the more solid promise of assuring the preservation of competition. Nevertheless I think that rejection of a continuance of the trusteeship in favor of divestiture should, in the peculiar setting of this case, be based on experience rather than speculative apprehension.

pulsory leasing provisions discussed in the Court's opinion are to be in effect. Finally, the decree removes Norris and Wirtz as officers and directors of Madison Square Garden, and enjoins them from holding such positions in the future.

Three factors seem to me especially compelling toward such a course. In the first place, this cannot properly be considered a case of reprehensible immoral conduct or willful lawbreaking.[2] Not until January 31, 1955, when this Court handed down its opinion in *United States* v. *International Boxing Club,* 348 U. S. 236, did it become known that professional boxing was even subject to the federal antitrust laws. In view of this Court's earlier decisions in the baseball cases, *Federal Baseball Club* v. *National League,* 259 U. S. 200, and *Toolson* v. *New York Yankees, Inc.,* 346 U. S. 356, I think it reasonable to say that in 1949 when this alleged conspiracy began most well-informed lawyers believed that professional boxing, like professional baseball, was beyond antitrust stricture. Hence the appellants had every reason to believe their actions were innocent when taken. Putting the matter somewhat differently, we should be slow in lending approval to the use of such a drastic remedy as this in a case where the appellants have never had the opportunity to demonstrate their willingness to comply with the law once they have learned that it applies to their activities. In my opinion, the thrust of this factor is not blunted by arguing, as the Court does, that appellants should voluntarily have done something to unscramble their relationships during the two and a half years that elapsed between the Court's decision in the original *International Boxing* case and the entry of the present decree. That sort of squeeze play should not be expected of those already involved in a lawsuit.

---

[2] The District Court put the matter in this way: "I don't charge them [Norris and Wirtz] with malicious intentional and moral wrongdoing, nor do I proceed to formulate the decree on such a basis. They are guilty, if anything, of a moral, prohibitive wrong which was in doubt as to whether it was even prohibitive at the time some of these acts were done, and serious doubt, but most people held it was not."

Further, divestiture here is brought to bear upon a large investment much of which was acquired long before the conduct charged in this case began, and the balance of which was obtained prior to the announcement of the *International Boxing* decision. The "unlawful fruits" doctrine accordingly offers no justification for this divestiture. Although recognizing this to be true, the Court states that the Garden stock was nonetheless utilized as means of accomplishing the antitrust violations. But this is just another way of saying that divestiture is a necessary element of effective relief; it affords no independent justification for the employment of that remedy.

Lastly, the divestiture order reaches far beyond the subject matter of the action. It permanently removes Norris and Wirtz from all interest in the Garden, over 90% of whose activities are entirely unrelated to professional boxing.

*Third.* It is true, of course, that the trial court's considered judgment on what is necessary to dissipate the effects and prevent recurrence of an adjudged antitrust violation is entitled to much deference from this Court. But by the same token this Court, before it is asked to put its stamp of approval on such a drastic remedy as divestiture, is entitled to have a clear and unambiguous expression of the district court's reasoning in choosing such a course. Especially is this so where, as here, this Court is the sole reviewing authority and in consequence has not had the benefit of an intermediate review of the issues by a Court of Appeals. In my opinion this record leaves much to be desired in this regard. The most I can make of it, taking the case for divestiture most favorably to the Government, is that the District Court would have been justified in reserving that issue for consideration at the time the five-year trusteeship of the Norris and Wirtz stock expired. Certainly no adequate case for a present order of divestiture has been made out. In this view of

the matter it becomes unnecessary to discuss at this time the various "options" alternative to divestiture which were rejected by the District Court.

DISSOLUTION.

I can find no adequate basis for the order dissolving the two International Boxing Clubs. My difficulty with this aspect of the relief is sufficiently shown by the fact that, as I read the record, it would be permissible for Madison Square Garden and the Norris and Wirtz interests in Chicago to create new corporations carrying exactly the same name as the two present organizations. The only justification offered by the Government for this aspect of the decree is that the two clubs were instrumentalities of the antitrust conspiracy and that their dissolution was but an expedient for insuring that all of their illegal agreements had been put to an end. But since all such agreements, both written and oral, are already canceled by other provisions of the decree, and since there is no suggestion that the sweeping relief granted by the District Court has any loopholes which would permit these organizations to function improperly, this justification is hardly convincing. In these circumstances dissolution appears to me to be not only punitive but futile, something not promotive of sound antitrust law enforcement.

I would remand the case to the District Court with instructions to modify its decree by striking the provisions for compulsory sale of the Norris and Wirtz stock in the Madison Square Garden Corporation, reserving the issue of divestiture for further proceedings at the end of the five-year trusteeship period, and eliminating the requirement of dissolution of the two International Boxing Clubs.