**UNITED STATES of America,**
**Plaintiff,**

v.

**INTERNATIONAL BOXING CLUB OF**
**NEW YORK, INC., et al., Defendants.**

United States District Court
S. D. New York.
Aug. 16, 1963.

See also 178 F.Supp. 469.

John J. Galgay, John D. Swartz, William J. Elkins and Edward F. Corcoran, Attys., Dept. of Justice, Melville C. Williams and Harold Lasser, Sp. Assts. to Atty. Gen., Anti-Trust Div., New York City, for plaintiff.

Simpson, Thacher & Bartlett, New York City, Reid & Priest, Dwight, Royall, Harris, Koegel & Caskey, New York City, for defendants.

RYAN, Chief Judge.

The petitioners, Madison Square Garden Corporation, a Michigan corporation, and Madison Square Garden Boxing, Inc., its wholly owned New York corporate subsidiary, have moved for an order declaring that the final judgment has no application to them, or, alternatively, construing paragraphs 4 and 16 of the final judgment. As to paragraph 4, petitioners ask that it be construed as not prohibiting them from entering into a contract with a boxer providing for the promotion of more than a single profes-

sional boxing contest between that boxer and others within 8 months or, alternatively, modifying this paragraph so as to permit petitioners to contract with a boxer providing for the promotion of more than one bout. As to paragraph 16, petitioners ask that it be construed as having expired, or, alternatively, to modify the said paragraph by providing that the prohibition of the said paragraph shall expire upon this decision.

This suit under the anti-trust laws was filed in 1952 against International Boxing Club of New York, Inc., a New York corporation, International Boxing Club of Illinois, an Illinois corporation, Madison Square Garden Corporation, a New York corporation, James D. Norris and Arthur M. Wirtz. After trial a final judgment and decree was entered on July 2, 1957 (United States v. International Boxing Club, 171 F.Supp. 841 (S. D.N.Y.1957)). The decree was affirmed by the United States Supreme Court. International Boxing Club v. United States, 358 U.S. 242, 79 S.Ct. 245, 3 L. Ed.2d 270 (1959).

Paragraph 4 of the decree provides:

"The defendants, and each of them, are restrained and enjoined from entering into, directly or indirectly, any contract, agreement, or understanding, which provides, in terms or in effect, that a boxer shall not engage in a professional boxing contest for any person other than the defendants, or any of them. Provided, however, that nothing in this Section Four (4) shall be construed to prevent the defendants, or any of them from entering into a contract with a professional boxer providing for the promotion of a single professional boxing contest. After five (5) years from the date of entry of this Final Judgment, this provision shall not prevent the defendants, or any of them, from entering into a contract with a professional boxer providing for the promotion of a single professional boxing contest which contract may contain a provision that the contracting defendant shall have the right to promote one (1) return professional boxing contest between the same boxers within a period of not more than eight (8) months from the date of such professional boxing contest."

Paragraph 16 of the decree provides:

"For a period of five (5) years from the date of entry of this Final Judgment, the defendant Madison Square Garden Corporation is hereby restrained and enjoined from promoting, directly or indirectly, more than two professional championship boxing contests held during any period of twelve (12) consecutive months."

On the hearing of this application, we ruled that the injunction of paragraph 16, which prohibited defendant from promoting more than two championship bouts in a year, had expired on July 2, 1962, which was the end of the five-year period set by the decree, irrespective of the stay imposed during the pendency of the appeal. In spite of the fact that the injunction was rendered inoperative from October 29, 1957 to February 6, 1959, when the mandate from the Supreme Court became effective, we think that this was a sufficient time in which remedial and corrective measures by way of Governmental regulation, if any were to be imposed, or voluntary reformation could be effected. Whether or not it was voluntary, it appears from petitioners' brief that neither it nor its predecessor has during this time promoted more than two championship bouts a year. We also ruled that the decree applied to petitioners from the time they acquired the assets of defendant Madison Square Garden Corp., New York, including its stock and the arena Madison Square Garden, not only because petitioner succeeded to the title of defendant Madison Square Garden Corp., New York, but particularly in view of the fact that the ownership and control of the Garden as an arena suitable for presenting boxing contests was one of the principal means by which the conspiracy was made effective.

The command in the decree that defendant International Boxing Club of New York, Inc., be dissolved and that Norris and Wirtz divest themselves of their stock in Madison Square Garden Corp., makes it clear that a reorganized defendant to be bound by the prohibition of the decree was contemplated, or the decree would become a nullity.

This leaves for determination but one aspect of the relief sought by defendants and that is a construction of paragraph 4, which would not prohibit defendants from contracting for the promotion of "more than a single professional boxing contest" within 8 months or less or, in the alternative, a modification of paragraph 4 to so enable defendants. It is conceded by petitioners that there is no ambiguity in the first sentence of paragraph 4 and it is conceded by the Government that the 5-year period provided for in the third sentence has expired.

We, therefore, have an express prohibition against defendants entering into an exclusive contract with one boxer —be it with the same or different opponents—with an exception against this prohibition made in favor of one return bout between the same boxers within a period of not more than 8 months. So that under the unambiguous terms of this paragraph, beyond this 8-month return bout, defendants may not in the one contract sign up one boxer for any further bouts.

Any other interpretation makes nonsense of the entire paragraph, if not the decree.

The sole question, therefore, is whether conditions have so changed in the past five years as to justify a modification of the paragraph to lift this contractual prohibition and permit petitioner to sign up a boxer in the one contract to one or more contests with other boxers.

A hearing was held by the Court at which defendant and the Government presented evidence in support of and in opposition to such a modification respectively.

According to petitioners, the severe competitive disadvantage suffered by them is that, in the course of their business at considerable cost, they bring a boxer to New York from another state or a foreign country and are then precluded from deriving adequate financial benefits from the venture because they may not initially in the one contract sign the boxer up to any more than one fight; that the boxer goes home, necessitating a new expenditure to bring him back on a second contract; that this financial prejudice is particularly evident and unreasonable in the frequent cases where they spend money and incur great financial risk and "knowhow" to promote and introduce an unknown boxing figure on their national television program—money and time which they can never recoup by signing him up to various bouts because, after introducing him to the public, he is "snatched" and signed up by other promoters upon whom no contractual restriction is laid and who have run no financial risk. This, according to petitioners, is particularly unfair to them because, after they have enhanced the boxer's prestige and reputation by the television showing, they lose him to a competitor. Consequently, say defendant-petitioners, this restraint is precluding them from competing in the field and frustrating the purpose of the decree which is to promote unfettered competition.

Harold Markson, Managing Director of petitioner Madison Square Garden Boxing, Inc., testified on behalf of petitioner that, in the period 1959–1962, Madison Square Garden Boxing, Inc., promoted 24 fights in 1959; 24 in 1960; 23 in 1961; 27 in 1962. The accuracy of this has been stipulated by the parties and these figures are found in Exhibit "A" received by the Court.

The Government's position is not that there has been a change in conditions since the entry of the decree warranting its modification, but that conditions have changed in that petitioners are in a stronger position in the field than they were five years ago. In supporting this,

it points to the fact and, as to this, there is no dispute that petitioners are the only promoters of nationally televised boxing contests for which they receive from sponsors about $25,000 per show for 50 such shows annually; that because of the value of a televised bout to a boxer, petitioners are able to get the best boxers for their shows. That, in spite of what petitioners say as to a boxer going back home or being snatched up by competitors after petitioners have spent money to launch him, in 1962, the evidence shows that petitioners have successfully competed with their competitors in obtaining by successive contracts the services of the boxers they had initially promoted. In February, 1962 and in July, 1962, they promoted 2 fights by Moyer and in August and October, 1962, they promoted 2 fights by McClure, by two separate contracts, both of whom petitioners had originally introduced. The fact that petitioners were able to promote the above-mentioned two bouts in a much shorter period of time than the 8-month restriction, demonstrates their ability to compete with other promoters for subsequent contracts with their proteges, if in fact any such inability could be seriously contended for in the face of a superior arena and television exposure.

Petitioners have given not one instance where the fruits of their enterprise were snatched up by a competitor with no hope of bidding by petitioners.

In addition, the claim of difficulty of holding on to a foreign boxer to negotiate a new contract was not supported by any of the evidence. On the contrary, the evidence shows that in 1959 petitioners were able in the one year to promote 4 contests with the Mexican boxer Ortega; in 1960, 3; in 1961, 1; and in 1962, 1; for a total of 9 bouts in 4 years—as for the boxer Moyer from Oregon, cited by petitioners' witness Markson as an example of an expensive import because of the distance, petitioners promoted in 1959, 1 bout; in 1960, 3; in 1961, 3; in 1962, 3; a total of 10 bouts in 4 years; with Paret, the Cuban boxer, petitioners promoted 8 bouts in 4 years; and so on. (Exh. A) A reading of the list of bouts promoted by petitioners over the last four years shows the same name boxers with regularity.

Finally, the fact that their principal and only recognized competitor in major boxing contests, Championship Sports (formerly Feature Sports), promoted no more than 2 championship bouts in 1962 as compared with petitioners' promotion of one championship and 26 other bouts; in 1961 with Championship's promotion of one championship bout to petitioners' promotion of 2 championships and 21 others; in 1960 with Feature Sports' promotion of 1 championship bout to petitioners' 1 championship bout and 23 others; and in 1959 with petitioners' promotion of 24 non-championship bouts; speaks eloquently of the fact that petitioners do more boxing promotion than anyone else in the country and that it is admitted the Garden is the "center of boxing in the United States." (S.M. p. 51)

The Government offered the testimony of Alfred Bolan, Vice President and General Manager of petitioners' only competitor, Championship Sports, Inc., who testified that, although Championship Sports had promoted matches between foreign boxers, 4 in number, whose expenses it had paid, it had never attempted to sign up the boxer for future contests; that it had tried but had been unsuccessful in obtaining televised bouts either on a weekly or monthly basis because it was generally felt that one televised bout a week (petitioners') was all there was a Market for; that it attempted to license home-based arenas but was unsuccessful because there were so few available. The witness was comparatively new at the business of promoting boxing contests, having been doing this since 1960 only, having promoted no more than half a dozen fights, and having specialized primarily in the promotion of the heavyweight class fights—but it was also clear that this company was by petitioners' admission the only major competition petitioners had. According to the

witness, it had attempted but was unsuccessful in promoting other boxing contests because it could not get fighters of other classes.

Since June, 1960 to the present, Championship Sports (formerly Feature Sports) promoted every heavyweight title fight—4 heavyweight title fights and 1 heavyweight non-title fight. For these fights, Championship Sports was able to sell closed circuit T.V. and radio rights and was unsuccessful in selling the home television rights when it attempted to do so as to some of these fights.

The fact, therefore, of the witness' and that company's short experience while it would ordinarily affect the weight to be given his testimony as an expert and his unsuccessful attempts to compete with petitioners—points up quite clearly the fact that no one is competing successfully with petitioners on home television rights.

We take note of the fact that on July 22, 1963, Championship Sports promoted and lost the championship boxing match between Patterson and Liston, and that the consensus of opinion is that this lone competitor has retreated, leaving the arena to petitioners. We have, therefore, this situation: petitioners have the only nationally televised boxing contests in the country and the only boxing arena in the metropolitan area. There is no charge made and no evidence that petitioners have done anything violative of the decree to maintain the position they now enjoy in the field; what the reason was for their only competitor's lack of success is, therefore, not before us. Judging from the comparatively short time Championship Sports has been in the business, it may be lack of "knowhow" and financing which makes it difficult for it to compete. What does matter in this hearing, however, is the fact that competitive conditions in the industry do not prevail. Petitioners, far from being hampered in competition, presently are in a dominant position on home television rights.

The competition encountered from Championship Sports was minimal. The opportunities petitioners have to offer a boxer—Madison Square Garden Arena and television—far outweigh what others can offer. So that, on the ground advanced that they cannot compete because other promoters are not hampered in signing up their boxers and because they may lose foreign boxers, the petition to modify the decree must be denied.

Undisputably, petitioners could realize more profit were they permitted in the original contract to sign up a boxer they plan to introduce or sponsor for 2 more bouts, prior to his being launched in the public eye when, as an unknown, his fee would be lower than after he had, through petitioners' sponsorship, achieved prestige and even perhaps had gone home only to have to be brought back at petitioners' expense. But the decree of the Court is not to be modified lightly simply to assist petitioners in making more money. And that is just what this petition comes down to. The shape of events has not so changed since the decree was formulated as to have converted the prohibition of paragraph 4 into a wrong. United States v. Swift, 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999, cited in System Federation v. Wright, 364 U.S. 642, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961).

The fact that petitioners were not the actual doers of the so blatant wrongs found to have been perpetrated by original defendants is no reason for presently lifting these restraints of the decree. The essential good to be derived from competition in a particular industry does not change with the actors engaged in the industry.

Petition to modify paragraph 4 denied; so ordered.