**CHEROKEE LABORATORIES, INC.,**
Appellant,

v.

**ROTARY DRILLING SERVICES, INC.,**
et al., Appellees.

No. 22736.

United States Court of Appeals
Fifth Circuit.

July 25, 1967.

Rehearing Denied Sept. 13, 1967.

Rehearing En Banc Denied
Sept. 13, 1967.

Vernon O. Teofan, Dallas, Tex., Jack N. Price, Longview, Tex., for appellant.

Harry M. Crowe, Jr., Tulsa, Okl., Donald Carroll, Tyler, Tex., Thomas M. Phillips, James R. Coffee, Houston, Tex., Baker, Botts, Shepherd & Coates, Houston, Tex., Ramey Brelsford, Hull & Flock, Tyler, Tex., of counsel, for appellee, Monsanto Co.

Before RIVES, WISDOM and AINSWORTH, Circuit Judges.

RIVES, Circuit Judge:

The plaintiff [1] seeks damages arising out of alleged violations by defendants [2] of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C.A. §§ 1 and 2, and the Texas antitrust laws, Arts. 7426–7447, Vernon's Ann. Texas Revised Civil Statutes. The district court quashed the service of summons on the defendant Bartlett. At the conclusion of the plaintiff's evidence, the district court directed a verdict for the remaining defendants. From the ensuing judgment this appeal is prosecuted.

The complaint relates to a highly specialized commodity in a very limited market. Cherokee's principal business is that of marketing additives to mud systems in drilling oil and gas wells. The product Lytron 886, hereafter Lytron, is a chemical polymeric compound originally developed by Monsanto research chemists for its effects on the fertility and cultivation of the soil. On September 15,

---

1. Cherokee Laboratories, Inc., hereafter referred to as "Cherokee."

2. Monsanto Company, Rotary Drilling Services, Inc., Kenneth D. Fisher and F. M. Bartlett, hereafter referred to as "Monsanto," "Rotary," "Fisher," and "Bartlett," respectively.

1953, U.S. Patent No. 2,652,380, was granted to Monsanto covering the composition and manufacture of Lytron. Its attempts to market the product for soil treatment met with failure, but it soon discovered that Lytron had potential as a drilling mud additive.

Rotary is an Oklahoma corporation, whose sole stockholder, prior to January 1963 was Bartlett. In 1956, Rotary began selling Lytron as a flocculating agent, that is an agent which "flocs" or congeals drilled solids and bit cuttings and settles them out of the mud system. About 1957 Pan American Petroleum Corporation, with research laboratories in Tulsa, Oklahoma, began experimental work with Lytron through which it later discovered that Lytron, in addition to acting as a flocculating agent, would "beneficiate," that is extend the yield of bentonite, a clay used as a mud builder in drilling mud systems. On March 25, 1960, Pan American applied for a patent covering this unique combination of uses of this and similar products, and on December 25, 1962 was granted Patent Number 3,070,543. This suit relates to the market of products having the combined ability to flocculate and beneficiate drilling muds in the oil field drilling industry in the United States. We accept Cherokee's description of the relevant market:

"The Pan American patent actually defines the scope of the product market (i. e., products have combined beneficiating and selective flocculating abilities when used in a drilling mud system).

"Geographically, the market for the product is the United States. The size of the market is not measured by area, but by the number of wells in which low solids drilling fluids can be used (R. 1259). The market for Ben-Ex (Cherokee's tradename) is a fairly small percentage of the total wells drilled in the United States each year, but there are approximately 55,-000 to 60,000 wells drilled in a year, and an appreciable number of these are wells in which this material could

be used (R. 1327). According to Dr. Paul Hawley, of Pan American Petroleum Corporation, there are at least 5,000 wells per year drilled in which Ben-Ex could be used, and Pan American Petroleum Corporation drills about 500 of these (R. 1259). At the end of 1963, only approximately 1,000 of these wells, or 20 percent of the potential market, was being serviced (R. 1327).

"The market for Lytron 886 increased from 100 wells drilled in 1961, to a thousand wells per year by the end of 1963 (R. 1327). The principal customers for the product are Magnet Cove Barium Corporation, Houston, Texas; Baroid Division, National Lead Company, Houston, Texas; International Minerals and Chemicals Corporation, Houston, Texas; Milwhite Mud Sales Company, Houston, Texas, and numerous small mud companies (R. 1190)."

At about the same time as it filed its application for the patent, Pan American granted a nonexclusive license to Rotary to market the product. From early 1960 until January of 1963, Rotary did not have a sales organization; it made no sales of Lytron directly to drillers or mud service companies, but sold only to Cherokee for resale to the oil and gas industry. Cherokee, being the only concern selling the product during this period, developed the market and it became one of the most important products sold by Cherokee.

In February 1961, Monsanto and Rotary entered into the following written agreement:

"Rotary Drilling Services, Inc.
Post Office Box 7265
Tulsa, Oklahoma

Attention: Mr. F. M. Bartlett

Gentlemen:

Summarizing our previous correspondence and the discussions which you have had with Mr. Wilkinson, Monsanto proposes to reply (sic) on you to promote the use of our polyelectrolyte resin Lytron 886 as an

additive to oil well drilling muds on the following basis:

1. Monsanto will sell you your full requirements of Lytron 886 for a period of two years beginning March 1, 1961. The price and terms of sale of this product will be those currently in effect and as they may be changed from time to time. Current prices and terms of sale are set forth in the attached price schedule. Please note that, as set forth in the Conditions of Sale appearing on the reverse of the present price schedule, Monsanto cannot be liable for any claims arising from use of our products in a buyer's manufacturing processes or in combination with other substances.

2. Monsanto will refer to you all inquiries which it may receive during this two-year period relative to use of Lytron 886 in oil well drilling mud applications. You are aware, however, that we have other customers for this material and that legally we would have no right to attempt to restrict the end use made by others as to products sold them.

3. You agree to make all reasonable efforts to promote the use of Lytron 886 in oil well drilling muds through sales activities, advertising and other marketing efforts to be conducted by you and at your own expense. Monsanto will, however, stand ready to provide you such technical assistance as in our judgment would be helpful to support this promotional effort.

4. Prior to the expiration of the two-year period of this agreement, the parties will review the progress which has been made and the prospects, as they then appear, for future growth in your proposed use of Lytron 886

and will discuss an appropriate basis for a continued relationship.

"If the foregoing is agreeable with you and you wish to go forward in accordance with it, please so indicate by signing and returning to us the attached copy of this letter.

> Very truly yours,
> s/e C. L. Jones
> C. L. Jones
> Director of Sales
> Resin and Coating Products

mpd
Enclosures (2)
Date: . . . . . . .
Agreed to:
ROTARY DRILLING SERVICES, INC.
By s/ Floyd M. Bartlett
F. M. BARTLETT
Its President"

From 1955 until January 1963, Fisher was with Cherokee, first as sales engineer, then sales manager, then vice president and finally as president. In January 1963, Fisher and four of Cherokee's salesmen left Cherokee and joined Rotary which began selling directly to the mud companies.

Rotary was purchasing Lytron from Monsanto at 0.80 or 0.85 per pound, depending on whether it was purchased in carload or partial lots. Up to January 1963, Rotary was selling Lytron to Cherokee at $1.25 per pound and Cherokee was reselling it to mud companies at $2.00 per pound and to drilling companies at $2.85 per pound. Monsanto did not raise its price to Rotary. However after Rotary took over sole distribution of Lytron, it raised the price to Cherokee from $1.25 to $1.80 per pound. Rotary also absorbed freight to the nearest warehousing point to the customer, and reduced its price to customers on sales from 10,000 to 20,000 pounds from $2.00 to $1.90 per pound, and at 20,000 pounds or over to $1.80 per pound.

On February 1, 1963, the sales agreement between Monsanto and Rotary here-

tofore quoted, supra pp. 100, 101, was renewed by letter agreement as follows:

"Rotary Drilling Services, Inc.
Post Office Box 7265
Tulsa, Oklahoma
Attention: Mr. F. M. Bartlett
Gentlemen:

Monsanto Chemical Company is agreeable to the renewal of our agreement dated February 13, 1961, for a period of two years beginning March 1, 1963. A copy of the terms of this agreement is attached.

If the foregoing is agreeable with you, and you wish to go forward in accordance with it, please so indicate by signing and returning to us the attached copy of this letter.

Very truly yours,
s/ T. B. Wilkinson
T. B. Wilkinson
Product Sales Manager
Industrial Resins

TBW:lhs

Date: Feb. 1, 1963

Rotary Drilling Services, Inc.

By s/ F. M. Bartlett
F. M. Bartlett
Its President"

Cherokee attempted to purchase Lytron from Monsanto but was informed "that they had some sort of arrangement with Rotary Drilling Services whereby all of the oil field sales had to go through Rotary." The last purchase of Lytron by Cherokee was from Rotary of 2000 pounds at the increased price of $1.80 per pound on April 29, 1963. Cherokee then ceased to sell Lytron, leaving Rotary as the only seller of that product to the oil and gas industry in the United States.

There was only one other product known to anyone other than Pan American which might possibly perform the same functions as Lytron, i. e., beneficiate or extend the yield of bentonite clay and flocculate or drop out drill solids. This product was manufactured by the General Aniline and Film Corporation. For the required function, it was mixed with soda ash. When so mixed the product was called "Gantrez." The research and development department of Cherokee discovered this use of Gantrez in late 1961 or early 1962. A use patent was denied because such use was already covered by the Pan American patent. In the spring of 1962, Cherokee attempted to get the product licensed by Pan American, but without success. Pan American's tests proved to its satisfaction that Gantrez was not a satisfactory product for this use. Lytron is the only product ever approved by Pan American under its patent. As to Pan American's laboratory tests of Gantrez, Dr. Paul Hawley testified:

"Several such tests have been made. One was made when the material was originally submitted to us early in 1962, probably in the month of February. The other tests were made in late 1963 and early in 1964. In all of the tests, approximately the same results were obtained on the properties which we looked for in a material which is supposed to be a good bentonite beneficiater and a drilling solids flocculent. The material tested was not outstanding. It was better than some other materials we had tested and not as good as several others, including Lytron 886."

Commencing in October or November 1963, Cherokee attempted to market Gantrez which it represented as its new and improved Ben-Ex. Effective April 8, 1964, Cherokee secured a license agreement from Pan American subject to several provisos, including the following:

"Licensee agrees that in its sales and promotion efforts it will not represent that Pan American endorses in any way the use of a mixture of Gantrez resin and soda ash, or its equivalent as a drilling mud additive."

Cherokee made ten or twelve sales of Gantrez amounting to approximately 4000 pounds. The market then suddenly "dried up" after Pan American sent a letter to its field offices stating that

Cherokee's product was inferior to Lytron.

## I.

The district court erred in quashing the summons served upon the defendant Bartlett. That service was under Article 2031b, Texas Civil Statutes, which provides for service on a nonresident who "engages in business" in Texas by serving the Secretary of State, as agent, in any suit "arising out of such business done in this State." Section 4 of the Article provides:

"[A]ny * * * nonresident natural person shall be deemed doing business in this State by entering into contract by mail or otherwise with a resident of Texas to be performed in whole or in part by either party in this State, or the committing of any tort in whole or in part in this State."

The complaint contained a number of allegations which would charge Bartlett with doing business in Texas. Among others, it charged that he committed a tort which included a conspiracy with Fisher, then a resident of Texas, to be performed in part in Texas, the purpose and eventual result of which was to induce Cherokee's sales force to leave Cherokee and join Rotary. Service of process on Bartlett was valid.

## II.

We review the district court's direction of a verdict for the defendants in the light of the Supreme Court's statement that "the right to trial by jury applies to treble damage suits under the antitrust laws, and is, in fact, an essential part of the congressional plan for making competition rather than monopoly the rule of trade, see Fleitmann v. Welsbach Street Lighting Co., 240 U.S. 27, 29 [36 S.Ct. 233, 234, 60 L.Ed. 505]." Beacon Theatres v. Westover, 1959, 359 U.S. 500, 504, 79 S.Ct. 948, 953, 3 L.Ed. 2d 988.

So far as the testimony has developed, there is no real dispute about the substantive facts. The case turns on the inferences to be drawn from those facts. In a recent opinion by Chief Judge Tuttle,[3] this Circuit has held that Lavender v. Kurn, 1946, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916, has general application in determining whether the evidence is sufficient to raise a question for the jury:

"If proven facts do give support to the inference necessary to sustain a plaintiff's case, then, under the rule of *Lavender*, it is immaterial that they give equal support to a contrary inference. It is only when there is a *complete absence* of probative facts to support the conclusion reached that the jury's judgment may be ignored."

The district court stated its reasons for directing a verdict as follows:

" * * * I have been unable to find any case by any Court of Appeals or by the Supreme Court that has in anywise held contrary to or overruled the holding of the Court of Appeals of the Fifth Circuit in Kinnear-Weed versus Humble Oil and Refining Company [214 F.2d 891, 894] to the effect that public injury is a necessary condition precedent to a cause of action such as that asserted by the Plaintiff in this case under the Federal antitrust laws.

"Now, in each case that the Plaintiff has cited to the Court there has been a holding that that particular alleged violation, or violations there, was a violation per se. The evidence in this case wholly fails to establish, in my opinion, a per se violation of the antitrust laws.

"And, while I think there are some merits maybe to some of the other grounds asserted by the moving Defendants in their Motion for Instructed Verdict, insofar as the Federal antitrust laws are concerned, I need not go any further than this determination that the Plaintiff has wholly failed to establish in this case any public injury."

---

3. Planters Manufacturing Company v. Protection Mutual Ins. Co., 5 Cir. 1967, 380 F.2d 869.

"Furthermore, I find and conclude that the Plaintiff has wholly failed to establish a case under the Texas antitrust laws.

"Therefore, the Motion for Instructed Verdict of each of the Defendants will be granted."

### III.

■■ In Rogers v. Douglas Tobacco Board of Trade, Inc., 5 Cir. 1959, 266 F. 2d 636, 644, we again gave consideration to the question of showing public injury in private Sherman Act cases and said:

"In the Sherman Act Congress has determined that certain prohibited activities are injurious to the public. * * * As to classes of restraints which from their 'nature or character' are unduly restrictive, Congress has determined its own criteria of public harm. Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 709, 3 L.Ed.2d 741. In restraints, like the present one to which 'the rule of reason' applies, while the jury should not, and cannot properly, reject the policy of the Sherman Act which has been determined by Congress, it must still decide whether the particular conduct is reasonably calculated to prejudice the public interest which that Act is designed to protect. * * * That does not mean that specific public injury must be proved before a private person can recover; but before it can be said that the conduct is forbidden as *unreasonably* restraining trade or commerce within the meaning of the Sherman Anti-Trust Act it must appear that it *tends* or is *reasonably calculated* to prejudice the public interest."

We adhere to those views. They are sustained in a full discussion in a recent text, Timberlake, Federal Treble Damage Antitrust Actions, ch. 15, §§ 15.01–15.07, pp. 191–206.

"When the factual situation does not present a per se violation, before a violation may be found, it must be determined that the activity unreasonably restrains trade. If it is not unreasonable it is not a violation. The only way in which to determine whether an activity is unreasonable is to apply the test of injury to the public as part of the broader test of the rule of reason." [4]

■ If the evidence presented no more than the substitution of Rotary for Cherokee as the exclusive distributor of Lytron, there would be no public injury because there would be no more restraint of trade than existed at the time of the substitution. That is, however, too narrow a view. Cherokee complains that it was prevented from marketing Lytron in competition with Rotary. It was open to the jury so to find, and further to find that such a restraint is reasonably calculated to prejudice the public interest. Rotary bought Lytron from Monsanto at 80 cents per pound and resold it to the mud companies at $2.00 per pound. A jury could reasonably infer that if Rotary had competition the markup in price would be somewhat less than 150 percent. Further, Rotary was servicing only about 1000 wells per year out of a potential of at least 5000 wells per year. With two distributors competing, some of the remaining 80 percent of the potential market might have been serviced with resultant savings in drilling costs.

■ It was clearly open to the jury to infer from the original letter agreement, dated February 13, 1961, between Rotary and Monsanto and the correspondence leading up to that agreement that Rotary was to be the exclusive distributor of Lytron to the oil industry and that Rotary agreed to limit its sales to that industry. We agree that Cherokee proved no injury from that limitation, for Cherokee was interested only in sales to the oil industry. We agree also that,

4. Timberlake's full discussion demonstrates, we think, that this view is consistent with recent Supreme Court decisions dealing with allegations and proof of "public injury" in private actions under the antitrust laws.

even though Rotary was to be the exclusive distributor, the initial distributorship agreement between Monsanto and Rotary may have been entirely reasonable and legal. Monsanto's attempts to market Lytron had been unsuccessful. At that time no one other than Rotary and its sole stockholder, Bartlett, expressed an interest in undertaking to develop and distribute Lytron in the oil and gas market. The market was in its infancy. Monsanto sought to establish a market for Lytron by placing it in the hands of a single distributor who would actively promote and stimulate sales for the product. We need not review the many authorities cited by the parties on the validity of exclusive dealership agreements, for the law has been fairly summarized by the Supreme Court in the very recent case of United States v. Arnold, Schwinn & Co. et al., 388 U.S. 365, 376, 87 S.Ct. 1856, 18 L.Ed.2d 1249, decided June 12, 1967:

> "At the other extreme, a manufacturer of a product, *other and equivalent brands of which are readily available in the market,* may select his customers, and for this purpose he may 'franchise' certain dealers to whom, alone, he will sell his goods. Cf. United States v. Colgate & Co., 250 U.S. 300, [39 S.Ct. 465, 63 L.Ed. 992] (1919). If the restraint stops at that point—if nothing more is involved than vertical 'confinement' of the manufacturer's own sales of the merchandise to selected dealers, *and if competitive products are readily available to others,* the restriction, on these facts alone, would not violate the Sherman Act." (Emphasis added.) (87 S.Ct. p. 1864.)

■ In the present case it was open to the jury to infer that competitive products were *not* "readily available" to others. Even so, we need not decide whether a jury could properly determine that the initial distributorship agreement constituted an unreasonable restraint of trade. The critical time in this case is when their sales agreement was renewed in February 1963.

The situation had radically changed in the two years since the original agreement. While the market was not completely developed, it was no longer in its infancy. Roughly 1000 of the potential 5000 annual drillings of wells were being serviced as compared with service to only 100 wells drilled in 1961. Monsanto's sales of Lytron to Rotary had been multiplied many times:

| "Year | | Pounds | | Price |
|-------|---|--------|---|-------|
| * | * | * | * | * |
| 1960 | | 11,000 | | 9,350.00 |
| 1961 | | 36,500 | | 31,025.00 |
| 1962 | | 112,340 | | 93,337.00 |
| 1963 | | 172,750 | | 138,200.00" |

■ Of more immediate concern, the jury could have found that Rotary had excluded Cherokee from the market and that Monsanto had some knowledge or notice of the dealings between Rotary and Cherokee.

■ Indeed, in the state of the record when the verdict was directed at the conclusion of the plaintiff's evidence, we think that the jury could have inferred the existence of facts constituting a per se violation of Section 1 on the part of Rotary and Monsanto. The jury could have found that Monsanto refused to deal with Cherokee because of its agreement with Rotary, and that Rotary priced Cherokee out of the market which it was able to do only because of the protection of its agreement with Monsanto. Such conduct would constitute a per se violation of Section 1.[5] See White Motor Co. v. United States, 1963, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738; Klor's, Inc. v. Broadway-Hale Stores, Inc., 1959, 359 U.S. 207, 79 S.Ct. 705; Northern Pacific Railway Co. v. United States, 1958, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545; Lorain Journal v. United States, 1951, 342 U.S. 143, 154, 155, 72 S.Ct. 181, 96 L.Ed. 162; Wash-

---

5. Unless Gantrez was truly a competitive product with Lytron, which, as hereinafter discussed, also presents a question of fact for the jury.

ington State Bowling Prop. Assn. v. Pacific Lanes, Inc., 9 Cir. 1966, 356 F. 2d 371.

We have thought it necessary to discuss at any length only the agreements between the two corporations, Cherokee and Rotary, for the evidence clearly developed a case for the jury's determination as to whether Fisher agreed with Rotary and its sole stockholder Bartlett that Fisher and four salesmen would leave Cherokee and join Rotary to promote Rotary's sale of Lytron and to exclude Cherokee from the market.

We hold that lack of proof of public injury, the reason relied on by the district court, did not justify its direction of a verdict for the defendants. It is suggested that two other grounds existed for a direction of the verdict, viz.: a failure of proof as to damages and Monsanto's rights under its patent.

Cherokee's projection of its lost profits was based upon the assumption that Cherokee remained the sole seller of Lytron and that its and Rotary's roles were reversed. Since Cherokee was excluded from the market, those were the only available figures from which the jury could infer what Cherokee's loss as a competitor would have been. Such deduction or inference was, of course, necessary.[6] If the defendants are guilty of excluding Cherokee from the market as a competitor, they cannot complain of the lack of evidence for which they are responsible. Once the fact of injury is established, the jury has considerable leeway in assessing the amount of damages. Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co., 9 Cir. 1960, 284 F.2d 1, 32, rev'd on other grounds, 1962, 370 U.S. 19, 82 S.Ct. 1130, 8 L.Ed. 2d 305.

Monsanto insists that there was no substantial evidence to show the *fact* as distinguished from the *amount*

of damages, because Cherokee's failure in marketing the competitive product Gantrez was due solely to Pan American's disparagement of that product combined with Cherokee's own business ineptitude. The jury could have determined that Pan American was justified in discouraging the use of Gantrez under its patent and that such action was reasonably to be anticipated. Whether Cherokee suffered losses attributable to antitrust violations or to other economic factors were matters for the jury's consideration and determination.

As to Monsanto's patent, we need go no further than the "starting point":

"Our starting point is the general rule that the first authorized sale of a patented article 'exhausts' the patent monopoly.[64]

[64]. Hobbie v. Jennison, 149 U.S. 355 [13 S.Ct. 879, 37 L.Ed. 766] (1893); Adams v. Burke, 17 Wall. 453 [21 L. Ed. 700] (U.S.1873); United States v. Univis Lens Co., 316 U.S. 241 [62 S.Ct. 1088, 86 L.Ed. 1408] (1942); Cf. Mitchell v. Hawley, 16 Wall. 544 [21 L. Ed. 322] (U.S.1873)."

Report of the Attorney General's National Committee to Study the Antitrust Laws (1955), at 240. Monsanto's patent did not permit it to vest Rotary with the arbitrary power to price Cherokee out of the market. Nor could Monsanto's contract with Rotary operate to combine its patent monopoly with that of Pan American and thus to vest in Rotary power to price a competitor out of the market. See United States v. New Wrinkle, Inc., 1952, 342 U.S. 371, 378, 379, 72 S.Ct. 350, 96 L.Ed. 417.

## IV.

We think also that the evidence presented a case for the jury's determination as to whether the defendants monopolized or attempted to monopolize the market in violation of Section 2 of the Sherman Act. Rotary remains

---

6. We do not mean to imply that the jury must necessarily have found a lesser amount as Cherokee's damages. Eighty percent of the market was undeveloped and competition in the field would not necessarily have resulted in price reduction or in decrease of the volume of sales.

the sole distributor of any product having the combined ability to flocculate and beneficiate in the drilling of oil wells in the United States. Pan American has approved no product other than Lytron for use under its patent. It was for the jury to say whether the realities of the market situation eliminate Gantrez as an effective substitute for Lytron. No other substitute exists, except perhaps some within the exclusive knowledge of Pan American and which it refuses to reveal. In this limited and narrow field it was open to the jury to find that the defendants monopolized or attempted to monopolize the market. Compare United States v. E. I. DuPont De Nemours & Co., 1956, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264.

## V.

The district court did not err in directing a verdict for the defendants as to any violation of the Texas antitrust laws. There was no evidence that Monsanto or Rotary imposed any restriction on intrastate commerce. The dealings between Monsanto and Rotary were in interstate commerce, and Monsanto's refusal to deal with Cherokee was in interstate commerce. Any restraint on the marketing of the product was imposed in interstate commerce and not after the product had been put into intrastate commerce. The legality vel non of the dealings should be tested by the federal antitrust laws and not by those of the State of Texas. Sloan v. Miami Margarine Co., Tex.Civ.App.1952, 247 S.W. 2d 169, 171, 172; Denison Mattress Factory v. Spring-Air Co., 5 Cir. 1962, 308 F.2d 403, 413.

The judgment is reversed and the cause remanded for further proceedings consistent with this opinion.

Reversed and remanded.

### ON PETITION FOR REHEARING OR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing filed by Appellee Monsanto Company is denied, and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, Rule 25a, subpar. (b), Monsanto's Petition for Rehearing En Banc is denied.