BOARD OF REGENTS OF the
UNIVERSITY OF OKLAHOMA
et al., Appellees,

v.

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION et al., Appellants.

No. 50149.

Supreme Court of Oklahoma.

Feb. 1, 1977.

500

Crowe, Dunlevy, Thweatt, Swinford, Johnson & Burdick by Ben L. Burdick, Clyde A. Muchmore, Richard C. Ford, John J. Griffin, Jr., Oklahoma City, for appellees.

Fellers, Snider, Blankenship & Bailey by James D. Fellers, John Joseph Snider, Oklahoma City, for appellants; Swanson, Midgley, Gangwere, Thurlo & Clarke by George H. Gangwere, John J. Kitchin, Kansas City, Mo., of counsel.

John Irvan Moritzky Choate, Sand Springs, for amicus curiae.

HODGES, Chief Justice.

This is an appeal from an order of the district court granting a temporary injunction which enjoined enforcement of bylaw 12–1 of the National Collegiate Athletic Association (NCAA) which limits the number of coaches a Division I member of the NCAA may employ.

The NCAA asserts that injunctive relief is not proper [1] and that an adequate remedy at law exists based on an action by the coaches to recover for breach of contract.[2]

The ultimate issue is whether the trial court abused its discretion in granting the temporary injunction. This Court pursuant to 12 O.S.1971 § 952(b)(2) [3] may reverse, vacate or modify a judgment of the

---

1. Injunctive relief is proper according to 12 O.S.1971 § 1382 under the following circumstances:

When it appears, by the petition, that the plaintiff is entitled to the relief demanded, and such relief, or any part thereof, consists in restraining the commission or continuance of some act, the commission or continuance of which, during the litigation, would produce injury to the plaintiff; or when, during the litigation, it appears that the defendant is doing, or threatens, or is about to do or is procuring or suffering to be done, some act in violation of the plaintiff's rights respecting the subject of the action, and tending to render the judgment ineffectual, a temporary injunction may be granted to restrain such act. And when, during the pendency of an action, it shall appear, by affidavit, that the defendant threatens or is about to remove or dispose of his property with intent to defraud his creditors, or to render the judgment ineffectual, a temporary injunction

may be granted to restrain such removal or disposition. It may, also, be granted in any case where it is specially authorized by statute.

2. In *State Board of Public Affairs v. Principal Funding Corp.*, 542 P.2d 503 (Okl.1975) this Court held that where the state enters into a valid contract with proper state officials and a valid appropriation has been made therefor, an individual may seek redress for breach of the state's contractual obligations.

3. Pursuant to 12 O.S.1971 § 952(b)(2) the Supreme Court may reverse, vacate or modify any of the following orders of the District Court:

An order that discharges, vacates or modifies or refuses to vacate or modify a provisional remedy which affects the substantial rights of a party; or grants, refuses, vacates, modifies or refuses to vacate or modify an injunction; grants or refuses a new trial; or vacates or refuses to vacate a final judgment.

district court where, on review it appears from the nature of the case and all the facts properly before the court the plaintiff was not entitled to an injunction and that it should not have been granted.[4] An action for injunction is one of equitable cognizance and this Court will consider all the evidence on appeal.[5] The granting of injunctive relief will not be reversed on appeal unless the trial court clearly abused its discretion.[6] In order to determine whether there was an abuse of discretion, a review of the facts and the law is essential.

The NCAA is a voluntary association comprised of approximately 800 members. Its active members are four-year colleges and universities located throughout the United States of which approximately 137, including the University of Oklahoma, are Division I members in football. One of the purposes of the NCAA is to legislate, through bylaws or by resolution of a convention, upon any subject of general concern to the members in the administration of intercollegiate athletics. A fundamental policy is the application of legislation governing the conduct of intercollegiate athletic programs of member institutions to basic athletic issues, such as admissions, financial aid, eligibility and recruiting.[7] The NCAA has among its purposes the initiation, stimulation, and improvement of intercollegiate athletic programs for student-athletes, and the promotion and development of educational leadership, athletic excellence, physical fitness, and sports participation as a recreational pursuit. It also seeks to encourage its members to adopt eligibility rules to comply with satisfactory standards of scholarship, sportsmanship, and amateurism. In furtherance of these purposes, the NCAA has certain fundamental policies which recognize that the competitive athletic programs of the colleges which are members of the NCAA are designed to be a vital part of the educational system. It also seeks to maintain such intercollegiate athletics, including coaching activities, as an integral part of that educational program, and to maintain the athlete as an integral part of the student body. It seeks to maintain a clear line of demarcation between college athletics and professional sports, so that intercollegiate football will be played by amateur student-athletes who engage in such sports for education, physical, mental, and social benefits and to whom participation in such sports is an avocation rather than a business.

There are definite procedures for adopting the rules and regulations of the NCAA. Basically, the legislation policies of the NCAA are initiated by an active member or an allied conference submitting a proposed amendment. It must be circulated by a certain deadline to all member institutions, after which there is an opportunity for each member to submit proposed amendments. An annual convention is held to which all of the delegates from all of the membership are assembled and vote on the proposed amendment which has been previously circulated. Amendment of the Constitution requires a ⅔ vote of those present and the bylaws require a majority vote. The bylaws are adopted by the membership following established procedures which the members themselves have adopted and the bylaws are then enforced by and against the member institutions. A member joins the organization by its own voluntary action, agrees to be bound by the NCAA's rules and regulations and is thereby obligated and responsible to administer its athletic program in accordance with the bylaws adopted by the membership.

In its January Convention, the NCAA membership in convention adopted a resolution which directed the NCAA Council, the

---

4. *Quaker Oil & Gas Co. v. Jane Oil & Gas Co.,* 63 Okl. 234, 164 P. 671, 674 (1917).

5. *Vickers v. Vining,* 452 P.2d 798, 802 (Okl. 1969).

6. *Harrison v. Perry,* 456 P.2d 512, 516 (Okl. 1969).

7. The purposes and fundamental policy and principles for the conduct of intercollegiate athletics are set forth in the NCAA Const. Arts. 2 and 3.

eighteen-person governing board of the Association, to call a special meeting on economy. A representation of all the Divisions of the NCAA, as well as representatives of the college presidents, faculty representatives, athletic directors and coaches attended the meeting. These representatives discussed and recommended areas where costs could be curtailed, new areas to obtain additional revenues for funding the existing athletic programs, and expansion of programs, including opportunities for women student-athletes, and to increase competitive opportunities. After the special meeting in April of 1975, the council recommended to the NCAA Council that a special convention of the NCAA be called to submit the proposals on economy to the general membership. All members were sent the official convention notice and program on June 30, 1975, containing the legislative proposals to be discussed, including the size of the coaching staff.

The special convention was held in Chicago, Illinois on August 14–15, 1975, and was attended by OU President Paul Sharp, Interim Provost J. R. Morris, Faculty Athletic Representative David Swank, and Director of Athletics Wade H. Walker. Art. 3 of the NCAA Constitution was amended by a ⅔ vote of the delegates of all three divisions to enable the members of each division to consider coaching staff limits as a subject of general concern. As enacted it provides as follows:

"Section 10. *Principle Governing Personnel and Squad Limitations.* The Bylaws of the Association may prescribe limitations as to the number of coaches a member institution may employ or otherwise utilize, the size of a squad in any sport and game scouting activities."

The provisions dealing with personnel and squad limitations, which are now bylaw

12–1 and the subject of this litigation, were adopted by a majority vote of the members of Division I in football on August 15, 1975. A summary of the legislative decisions, along with certain council interpretations, was mailed to the membership August 22 and the legislative changes were published in an NCAA memorandum dated September 15, 1975.

The provisions of bylaw 12 were further reviewed and amended in January, 1976. Efforts to delete Section 1 were defeated. Bylaw 12–1 became effective August 1, 1976, and provides:

"Section 1. *Number of Coaches.* A member institution shall not employ or otherwise utilize the services of coaches in excess of the following numbers: (a) Division I Football—One head coach, eight assistant coaches, two part-time assistant coaches."

Each of the plaintiff assistant coaches was hired by OU on an annual basis. Their current contracts date variously either from January or February of 1976, and for the first time the contracts included a provision stating OU's policy that "all assistant coaches will be retained in their positions so long as they carry out their responsibilities in a satisfactory manner." The coaches had been verbally advised of this provision in July, 1975. The limitations of bylaw 12–1 do not apply to assistant coaches who, because of academic tenure, enforceable contracts or formal security of employment commitments in effect on August 15, 1975, are entitled to continue in their jobs as assistant coaches.[8] However, it has been determined by the NCAA officers that these exceptions do not apply to any of the appellee assistant coaches under the official interpretation adopted by NCAA.[9] The coaches have not in this case pleaded or

8. NCAA Bylaw 12–1 § 1(i).

9. The NCAA interpretation of formal security of employment commitment contained in the NCAA Manual dated March, 1976 states:

Such a commitment shall be made in writing on or before August 15, 1975, and provide for employment past the August 1, 1976, effective

date of the legislation. Further, in order for an institution to exceed the limitation, the institution must be obligated through academic tenure, enforceable contracts or formal security of employment to all individuals in that category, including those in excess of the prescribed limitations.

otherwise raised any issues to the contrary. OU has, in fact, abandoned its appeal of such issues to the NCAA Council and has elected to attack the basic validity of the bylaw. OU does not contest the validity of bylaw 12–1 insofar as it limits recruiting activities to the number of coaches authorized by the rule. Apparently the contention is that coaches Jimerson and Shimek would have to be terminated or transferred to other duties if the football coaching limits are observed, and that the bylaw is invalid in so requiring.

Two other assistant coaches, Steve Barrett and Jim Helms, found similar employment at other institutions and have been voluntarily dismissed as appellees in this case. Thus, under the evidence at the hearing on preliminary injunction, it was only the status of coaches Jimerson and Shimek that remained to be resolved in this lawsuit. OU has chosen to hire appellee Selmon as a part-time assistant coach with other duties outside the athletic department.

■ It is asserted by the NCAA that judicial scrutiny of the bylaw is inappropriate.[10] Courts are normally reluctant to interfere with the internal affairs of voluntary membership associations, however, in particular situations, where the considerations of policy and justice are sufficiently compelling judicial scrutiny and relief are available. In dealing with an organization in which membership is an economic necessity, the courts must be particularly alert to the need for protecting the public welfare and advancing the interests of justice by reasonably safeguarding the individual's opportunity to earn a livelihood while not impairing the proper standards and objectives of the organization.[11] The necessity of court action is apparent where the position of a voluntary association is so dominant in its field that membership in a practical sense is not voluntary but economically necessary.[12] It was proper for the trial court to examine the validity of the bylaw.

■ Appellants also argue the activities of the NCAA are exempt from Sherman Act coverage because of state action, and allege that if a restraint is the result of valid governmental action as opposed to private action, there is no violation of antitrust laws. NCAA activities are not state action. In *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976) the United States Supreme Court held that the state action exemption was applicable only to the state itself or to state officers seeking immunity for anticompetitive activities taken pursuant to express legislative command. Here the State of Oklahoma through the Board of Regents is attacking the bylaw as being invalid under the state's antitrust laws. It is not

---

**10.** This Court may not ignore the power that monopolistic private associations exercise over their members. *McCreery Angus Farms v. American Angus Ass'n.,* 379 F.Supp. 1008, 1019 (1974) aff'd 506 F.2d 1404 (7th Cir. 1974) cited "Developments in the Law—Judicial Control of Private Associations," 76 Harv.L.Rev. 983, 994 (1963) for the premise that:

"Since the leaders of groups which have an economic stranglehold are relatively free from control by membership withdrawal, it would seem more important that other controls, such as judicial intervention be available . . . The group, then, may not be allowed to appeal solely to its own goals or justification, but may have to justify its practices in the light of broader social interests."

**11.** *Falcone v. Middlesex County Medical Society,* 34 N.J. 582, 170 A.2d 791, 797, 89 A.L.R.2d 952 (1961).

**12.** Cases from other jurisdictions which uphold judicial intervention into private associations which may determine matters of substantial economic moment and public interest follow: *McCreery Angus Farms v. American Angus Ass'n., id.; Van Daele v. Vinci,* 51 Ill.2d 389, 282 N.E.2d 728, 731 (1972); *Grempler v. Multiple Listing Bureau of Harford County,* 258 Md. 419, 266 A.2d 1, 5 (1970); *Pinsker v. Pacific Coast Society of Orthodontists,* 1 Cal.3d 160, 81 Cal.Rptr. 623, 460 P.2d 495 (1969); *Higgins v. American Society of Clinical Pathologists,* 51 N.J. 191, 238 A.2d 665, 669 (1968); *Courtesy Chevrolet, Inc. v. Tennessee Walking Horse Ass'n.,* 344 F.2d 860 (9th Cir. 1965), 393 F.2d 75 (9th Cir. 1968) cert. den. 393 U.S. 938, 89 S.Ct. 301, 21 L.Ed.2d 274 (1968); *Deesen v. Professional Golfer's Association of American,* 358 F.2d 165 (9th Cir. 1966); *Blende v. Maricopa County Medical Society,* 96 Ariz. 240, 393 P.2d 926 (1964); *In re Osteopathic Hospital Association of Delaware,* 41 Del.Ch. 206, 191 A.2d 333 (1963).

seeking an exemption from antitrust liability for its own conduct. Under *Cantor,* the NCAA is not entitled to assert the state action exemption.

The trial court determined that the bylaw operated to restrain trade in a per se violation of 79 O.S.1971 § 1.[13] We agree that facts reveal NCAA is a virtual monopoly engaged in interstate commerce;[14] and that the performance of personal services such as college football coaching constitute trade within the meaning of the phrase restraint of trade as used in the anti-trust laws.[15] Intercollegiate competition in events sponsored by the NCAA and in games arranged by member institutions involves to a great degree teams from different states. The NCAA negotiated television contracts with ABC which resulted in a total of 109 different institutions appearing in telecasts for two years of the plan in 1974 and 1975. Revenue was shared by 138 institutions during the two-year period. In 1975 the NCAA's participating members received $16,000,000 in television rights, of which the NCAA received a 6% assessment, and in addition revenue was received from 31,687,847 spectators attending games involving 634 colleges across the country. The NCAA sanctions all bowl games and NCAA members may not participate in a bowl unless it has NCAA sanction. It is an economic necessity that member schools belong to the NCAA regardless of the fact that it is a voluntary organization, and there is not a comparable organization OU may join to obtain analogous benefits.

We must determine whether the bylaw is an unreasonable restraint under the antitrust laws. For purposes of the Sherman Antitrust Act and the Oklahoma Statute, a restraint of trade may be unreasonable either because a restraint otherwise reasonable is accompanied with specific intent to accomplish a forbidden restraint or because it falls within a class of restraints that are illegal per se.[16] We do not agree with the finding of the trial court that the bylaw is a per se violation of the antitrust laws. Contracts in restraint of trade, if not contrary to public policy, violate neither the federal nor the state antitrust laws.[17] Per se violations of antitrust laws are those agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and, therefore, illegal without elaborate inquiry as to the precise harm they cause or the excuse for their use.[18] However, the area

---

**13.** The Oklahoma statutory equivalent to the Sherman Antitrust Act, 79 O.S.1971 § 1, provides:

Every act, agreement, contract, or combination in the form of trust, or otherwise, or conspiracy in restraint of trade or commerce within this state is hereby declared to be against public policy and illegal.

Likewise, the Sherman Antitrust Act, 15 U.S.C. § 1 provides in pertinent part:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

. . . ."

The trial court properly determined that valuable assistance in interpretation of 79 O.S.1971 § 1 may be gained from the manner in which various courts have interpreted the Sherman Antitrust Act.

**14.** The United States Supreme Court in *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 2013, 44 L.Ed.2d 572 (1975) held that it is no disparagement of the practice of law as a profession to acknowledge that the provision of its services are commerce, and that the profession acknowledge that it has a business aspect. Neither is it a disparagement to amateur athletics to acknowledge that there is a commercial aspect to the provision of coaching services and presentation of athletic contests to ticket buying and television viewing audiences.

**15.** See *United States v. National Association of Real Estate Boards,* 339 U.S. 485, 489, 70 S.Ct. 711, 94 L.Ed. 1007 (1950); *United States v. American Medical Association,* 72 U.S.App. D.C. 12, 110 F.2d 703, 708 (1940) *cert. den.* 310 U.S. 644, 60 S.Ct. 1096, 84 L.Ed. 1411 (1940).

**16.** *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 612, 73 S.Ct. 872, 883, 97 L.Ed. 1277 (1953).

**17.** *Thomas v. Belcher,* 184 Okl. 410, 87 P.2d 1084, 1085 (1939).

**18.** *White Motor Co. v. United States,* 372 U.S. 253, 262, 83 S.Ct. 696, 701, 9 L.Ed.2d 738 (1963).

**506**

of per se violations is carefully limited,[19] and because we have determined the restraint is not a per se violation we must turn to the rule of reason to interpret its validity or invalidity. All contracts among potential competitors are not prohibited nor even all contracts that might in some insignificant degree or attenuated sense restrain competition. Rather, with respect to most business combinations or contracts, there is applied, in determining whether a violation of the Sherman Act exists, a "rule of reason" analysis. This analysis includes facts peculiar to the business and in which the restraint is applied, the nature of the restraint and its effects, and the history of the restraint and the reasons for its adoption.[20] It is well settled that only undue or unreasonable restraints of interstate trade or commerce and not all possible restraints are prohibited by the Sherman Antitrust Act [21] and the statutes of the State of Oklahoma.[22] The true test of legality is whether the restraint imposed is such as merely regulates and thereby promotes competition or whether it is such as may suppress or destroy competition.[23] The fundamental test of the reasonableness of restraint is its effect on the public.[24]

■ It must be recognized that the NCAA is dedicated to the development of amateur sports and performs a valuable service to its members, but its activities also involve strong elements of public interest. In restraints like the present one, to which the rule of reason applies, it must be determined whether the particular action is reasonably calculated to prejudice the public interest the Act was designed to protect. This does not mean that specific public injury must be proved before a private person can recover, but before it can be said that the conduct is forbidden as unreasonably restraining trade or commerce within the meaning of the Sherman Antitrust Act it must appear that it tends or is reasonably calculated to prejudice the public interest. Except where a document is on its face in violation of the antitrust law, it is necessary to resort to outside evidence to determine whether the restraint imposed is unreasonable. All circumstances should be taken into consideration, including the relationship of the parties and their relation with the subject matter dealt with, its relation to the general public, the facts peculiar to the business, trade or profession, its condition before and after the restraint was imposed, the purpose sought to be attained, and the nature of the restraint and its actual or probable effect.[25]

■ The NCAA membership of Division I schools after a great amount of deliberation in an attempt to reduce costs, and to

19. *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 178, 86 S.Ct. 347, 351, 15 L.Ed.2d 247 (1965).

20. *United States v. Topco Associates, Inc.*, 405 U.S. 596, 608, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972).

21. *United States v. Topco Associates, id.; United States v. Columbia Steel Co.*, 334 U.S. 495, 68 S.Ct. 1107, 1121, 92 L.Ed. 1533, *reh. den.* 334 U.S. 862, 68 S.Ct. 1525, 92 L.Ed. 1781 (1948).

22. *Petition of Grand River Dam Authority*, 320 P.2d 706, 711 (Okla.1958).

23. *Board of Trade of City of Chicago v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918).

24. *Lynch v. Magnavox Co.*, 94 F.2d 883, 891 (9th Cir. 1938).

25. *United States v. Topco Associates, Inc.*, note 20, supra; *White Motor Co. v. United States*, note 18, supra; *Board of Trade of City of Chicago v. United States*, note 22, supra; *International Boxing Club of New York, Inc. v. United States*, 358 U.S. 242, 79 S.Ct. 245, 3 L.Ed.2d 270 (1959); *United States v. E. I. DuPont De Nemours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); *United States v. Columbia Steel Co.*, 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533, *reh. den.* 334 U.S. 862, 68 S.Ct. 1525, 92 L.Ed. 1781 (1948); *Appalachian Coals v. United States*, 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825 (1933); *Cherokee Laboratories, Inc. v. Rotary Drilling Services*, 383 F.2d 97, 104 (5th Cir. 1967) *cert. den.* 390 U.S. 904, 88 S.Ct. 816, 19 L.Ed.2d 870 (1968); *Petition of Grand River Dam Authority*, 320 P.2d 706, 710 (Okl.1958).

increase opportunities for colleges and institutions in all their athletic programs including opportunities for women athletes voted to adopt the bylaw. The avowed intent of the membership in adopting the rule was to equalize the opportunity in recruiting and attempt to make everyone begin on equal footing by curtailing potentially monopolistic practices by the more powerful schools and to reorient the athletic programs into their more traditional role as amateur sports operating as a part of the educational process. No effort is made by OU to establish a lack of reasonability in attempting to address the economic and competitive problems facing Division I institutions by means of bylaw 12–1. Rather, OU challenges the authority of the NCAA to attempt solutions in this particular manner. Since it is eminently reasonable for the NCAA to concern itself with the rising costs of amateur athletics, particularly in the field of football, and the ever increasing competitive imbalance among its Division I membership, the restraint cannot be unlawful when measured by the rule of reason unless the mechanism adopted to redress the problem fails to constitute a reasonable solution. OU offers no evidence tending to establish that bylaw 12–1 would not affect a cost reduction to athletic departments of Division I schools or that there is no competitive benefit to be derived from placing all member institutions on an equal footing with respect to the size of their coaching staffs. On the contrary, the evidence reflects that it is the considered opinion of a majority of the administrators, faculty, coaches and athletic directors of Division I colleges and universities that a limit on coaching staffs is the best way to achieve both goals. We do not choose to substitute our judgment for theirs. We find after an examination of the circumstances involving the adoption of the bylaw, the relationship of the parties, public interest, the facts

concerning participation in intercollegiate football, the nature of the NCAA[26] and the restraint and the purpose sought to be achieved by its adoption that measured by the rule of reason the bylaw is not an unreasonable restraint on trade. Rather, the evidence reflects that the avowed purpose of the bylaw is to foster, promote and maintain competition between Division I schools rather than to impede, suppress, or destroy competition.

■ It is argued that the bylaw violates the due process rights of the coaches. The exemption of academic tenure or of an enforceable contract or formal security of employment was not argued or promoted as an appeal. The employment of the coaches was tied to continued employment of the head coaches. The first written contracts pertaining to tenure were entered into on February, 1976, after the adoption of the bylaw and were for one-year periods. Had the coaches enjoyed academic tenure, or had formal written commitment existed before August 15, 1975, there would have been no reason for this appeal. The coaches do not attack the action of the University of Oklahoma, their employer, in selecting them for termination or reassignment, rather, suit is brought only against the NCAA to test the validity of the bylaw provision adopted by the members of a voluntary association which affects all Division I schools alike and likewise all coaches in Division I schools. The facts reveal the bylaw was enacted only after thoughtful deliberation and adequate notice with representatives of each member institution, including OU, in attendance at the meeting where it was discussed and adopted. It operates equally as a restriction on the membership, and is not personally directed to the appellee coaches. The bylaw is rationally related to its announced objective and is neither arbitrary nor invidiously dis-

---

**26.** Mere size unaccompanied by unlawful intent or conduct does not constitute a violation of antitrust laws. It is the existence of monopoly power coupled with the intent to use it for anticompetitive purposes or with inevitable anticompetitive effects that establishes the offense of monopolization. *United States v. Griffith,* 334 U.S. 100, 107, 68 S.Ct. 941, 92 L.Ed. 1236 (1948); *Deesen v. Professional Golfers' Ass'n. of America,* 9 Cir., 358 F.2d 165, 171 (1966).

criminatory, nor did its adoption violate due process.

 It is also argued that the bylaw constitutes a contract which restrains the coaches from exercising their lawful profession in violation of 15 O.S.1971 § 217.[27] We do not agree. The bylaw does not prevent the coaches from engaging in their trade as a coach. It merely limits the number of coaches that Division I schools may employ as assistant coaches. It does not require that OU terminate these particular coaches. The bylaw is not directed at any particular person. It applies equally to all members of Division I in football. The validity and enforceability of contracts in restraint of trade are determined by considerations of public policy. Restraint of trade to be illegal must be inimical to the public interest.[28] An agreement which is reasonable and proper and which the parties have a right to make is not void as contrary to public policy even though contractual duties toward third parties may be incidentally involved.[29] Statutes invalidating contracts in restraint of trade must be determined by its reasonableness in view of the particular circumstances.[30] An agreement in illegal restraint of trade is void, but an agreement in reasonable restraint of trade is valid.[31] We do not find that the bylaw provision is contrary to the public policy of the State of Oklahoma or that it unreasonably restrains trade in violation of 15 O.S.1971 § 217.

For the reasons enumerated, we find the trial court abused its discretion in granting the temporary injunction.

REVERSED.

LAVENDER, V. C. J., and DAVISON, WILLIAMS, IRWIN and DOOLIN, JJ., concur.

BERRY, BARNES and SIMMS, JJ., dissent.

BARNES, Justice, dissenting.

I respectfully dissent to the result reached by the Majority Opinion.

I agree that this is not a per se violation of the antitrust laws, but, on applying the rule of reason adopted by the Majority Opinion to determine if there is a violation of the antitrust laws, I am forced to conclude that Bylaw 12–1 is a pure and simple commercial restraint of trade. There are no redeeming features to this rule. Its only purpose seems to be to discourage competition and excellence· in Division I for economic reasons. Even the economic reasons are pointless. See page 16 of Appellants' Reply Brief where it is argued that "there is no basis for concluding that by limiting the number of coaches who may be employed that the salaries to be paid are thereby reduced and that the profits derived therefrom by the member institution are increased", because there is no restriction on salaries to be paid coaches and more money could be paid for coaches under the new rate than was paid when there was no limitation on the number of coaches.

The Appellants' Briefs are moot as to the reason that the smaller schools (Divisions II and III) are expressly excluded from the rule. One might speculate that after considering the other fuzzy reasoning incorporated in Bylaw 12–1 that it was felt by its framers that the smaller schools (Divisions

---

**27.** 15 O.S.1971 § 217 provides:

Every contract by which anyone is restrained from exercising a lawful profession, trade or business of any kind, otherwise than as provided by the next two sections, is to that extent void.
*Tatum v. Colonial Life & Accident Ins. Co. of America,* 465 P.2d 338 (Okla.1970). The statute precludes only those contracts which restrain the employee from in any manner or any extent whatsoever exercising a lawful profession, trade or business of any kind whatsoever.

**28.** *Richardson v. Paxten Co.,* 203 Va. 790, 127 S.E.2d 113, 117 (1962). See also *Hennessey v. NCAA* (N.D.Ala.1976).

**29.** *Gulf Refining Co. v. Boren,* 50 S.W.2d 883, 888 (Tex.Civ.App.1932).

**30.** *General Paint Corp. v. Seymour,* 124 Cal. App. 611, 12 P.2d 990 (1932).

**31.** *Griffin v. Oklahoma Natural Gas Co.,* 37 F.2d 545, 548 (10th Cir. 1930).

II and III) could better afford the larger staffs.

Although Appellants contend that their basic purpose is the initiation, stimulation and improvement of intercollegiate athletic programs for student athletes and the promotion and development of educational leadership, athletic excellence, physical fitness, and sports participation as a recreational pursuit, Bylaw 12–1, resulting as it did from a special meeting to determine ways to collectively reduce the costs of the members' athletic programs, would indicate that the true concern of the NCAA is how to run athletic programs at a profit to the member institutions. As previously stated, it could not effectively accomplish its purpose of enforced economy unless it also put a ceiling on the amount of salaries that could be paid to coaches. This would appear to me to be the next step for this organization if we permit Bylaw 12–1 to stand.

Bylaw 12–1 provides for an unwarranted, arbitrary invasion of the fiscal management of the participating schools. There is no way for a dissenting school to refuse to comply with the rule because their whole athletic program is dependent upon competition with other member schools. Part of Bylaw 12–1 itself provides for sanctions against a school that doesn't comply.

Bylaw 12–1 dictates that the coaches in question must be terminated, not because they are not needed, not because the University of Oklahoma cannot afford to pay their salaries, not because they have violated any of the rules of conduct adopted by the NCAA, the Big Eight Conference, or the University of Oklahoma, but merely because the majority of Division I schools have determined that they cannot afford more than nine full-time and two part-time assistant coaches, and therefore for them to be competitive with the more successful programs that all of the schools in their division should be prohibited from having more coaches than they can afford.

The Majority Opinion sets out the true test of legality, "whether the restraint imposed is such as merely regulates and there-by promotes competition or whether it is such as may suppress or destroy competition", citing *United States v. Topco Associates, Inc.,* 405 U.S. 596, 608, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972), and *United States v. Columbia Steel Co.,* 334 U.S. 495, 68 S.Ct. 1107, 1121, 92 L.Ed. 1533, reh. den. 334 U.S. 862, 68 S.Ct. 1525, 92 L.Ed. 1781 (1948). Here the restraint imposed by Bylaw 12–1 has the effect of destroying competition rather than promoting it. This is a flagrant restraint of trade, which has nothing to do with the improvement of intercollegiate athletic programs. It is violative of the antitrust laws of our state and our nation. We should not permit it to stand.

I respectfully dissent.

I am authorized to state that Justices BERRY and SIMMS concur in my dissenting views.