2013 OK 35

**WRIGHT CITY PUBLIC SCHOOLS and Wright City Board of Education, Plaintiffs/Appellees,**

v.

**OKLAHOMA SECONDARY SCHOOL ACTIVITIES ASSOCIATION, Defendant/Appellant.**

No. 111,729.

Supreme Court of Oklahoma.

May 31, 2013.

Kevin T. Sain, Idabel, Oklahoma, and Mark E. Fields, McAlester, Oklahoma, for appellee.

Mark S. Grossman, Oklahoma City, Oklahoma, for appellant.

TAYLOR, J.

¶ 1 The dispositive issue in this appeal is whether the trial judge erred in issuing the temporary injunction. The substantive issue in this appeal is whether the Executive Director of the Oklahoma Secondary School Activities Association (OSSAA) acted in an unreasonable and arbitrary manner when he imposed a forfeiture penalty against Wright City Public School (Wright City) for violation of OSSAA's 22–game limit baseball rule.

## I. Facts and Proceedings

¶ 2 The following are facts and circumstances gleaned from the parties' filings and testimony at the evidentiary hearing before the McCurtain County District Court. Having won the district and the regional tournaments, Wright City's varsity baseball team qualified for the eight-team, single-elimination Class A state championship tournament. The state tournament was scheduled for May 2 and 3, 2013.

¶ 3 The Wright City coach testified that on Monday, April 22, 2013, after winning the district tournament, he scheduled and the team participated in a five-inning, three-out/three-run game with the Idabel junior varsity team and he posted the results on-line at OKrankings.com. On Monday, April 29, 2013, after winning the regional tournament, the Wright City coach scheduled and the team participated in a five-inning, three-out/three-run game with Valliant. The coach considered the Idabel game to be a practice and the Valliant game to be a scrimmage. The coach was aware of the 22–game limit. OS-SAA General Baseball Regulations, Section VI(H) provides that "game limits for varsity games are 22 games and three tournaments." With the unfolding of events on April 30 and May 1, 2013, the coach testified that any mistake in scheduling or playing Idabel and Valliant was his fault and the team should not be punished.

¶ 4 The OSSAA assistant administrator in charge of fall and spring baseball, a staff member under the supervision of the Executive Director, testified that on April 30, 2013,

he received a telephone call from an unidentified person suggesting that Wright City exceeded the 22–game limit rule. The assistant administrator testified that he checked the on-line Okrankings.com and then contacted the school principal, the athletic director, and the coach. The Wright City principal and the coach admitted the team had participated in the Idabel junior varsity and the Valiant games. The coach explained that he thought the 22–game limit applied to regular season play but did not apply to post-season play.

¶ 5 Upon inquiry, the assistant administrator learned that four schools had violated the softball game-limit rule in the fall of 2012 and were given forfeiture penalties which eliminated two of the schools from the state championship tournament and placed the other two schools in the loser bracket. The assistant administrator testified that after "visiting with staff it was apparent that to the majority of us that this situation was similar to the softball situation so forfeit games would be appropriate." Tr., p. 67. The assistant administrator advised the Executive Director of the telephone tip and his investigation.

¶ 6 By letter dated that day, April 30, 2013, the OSSAA Executive Director advised Wright City of the 22–game limit violation and the coach's explanation. The letter explained that the game limit prevents some teams from gaining a competitive advantage and avoids overemphasis on one sport and advised that no exception exists for additional games beyond the 22–game limit in Section VI(H). The letter set out the penalty for the rule violation:

Generally when a team has participated in more contests than permitted under the rules and regulations for that sport, the team is required to forfeit or sit out of an equal number of contests after the violation has been discovered. In this instance, Wright City is required to forfeit its next game, which is the first round of the state championship tournament. This forfeit will eliminate the team from the state tournament and completes the baseball season for the team. Because Wright City played in a second game in excess of the limitation, the team also will be limited next year

to 21 match games and three tournaments in spring baseball, in addition to any state championship playoff games. The school further will be placed on warning for one year, meaning that the discovery of any other rule violations during the next year could result in the imposition of additional sanctions and penalties.

¶ 7 By letter dated May 1, 2013, the Wright City Board of Education and Superintendent requested a reconsideration of the Executive Director's April 30th forfeiture penalty. The request asserted that the coach has taken full responsibility and is remorseful for his mistake, and it asked that the penalty be revised to suspending the coach and forfeiting the opportunity to host a district or regional tournament in 2014 under the "precedence set in similar situations last spring at Guthrie and Sand Springs." It further urged that the penalty resulted in unfair tournament brackets.

¶ 8 Also by letter dated May 1, 2013, Wright City's coach sought reconsideration of the Executive Director's April 30th forfeiture penalty. The coach asked that the Guthrie situation serve as a guide:

Last Spring the Guthrie baseball team violated the amount of games played. It states in that article that team would be allowed to continue in the playoffs but without their head coach. They were forced to forfeit their last game that would have been the 23rd scheduled game. Forfeiting a district game should have prevented the team from playing in the post season, but OSSAA changed their ruling in favor of the kids to allow them to participate in the playoffs. They removed the probationary status and placed the school on warning status for one calendar year.

As to the issue of the teams unfair advantage, the coach urged:

Also, if this issue is about advantage by eliminating my team from the state tournament and making it a 7 team tournament with the # 2 seed Sterling receiving the bye, it puts the other 6 teams in the tournament at a disadvantage. With the pitching rule in place along with the all teams having to play and face elimination the first day, it will allow Sterling a major

advantage of preserving their pitching staff. This will not be fair. The tournament is set up to be an 8 team tournament, and for the integrity of the tournament, it should remain so.

¶ 9 On the same day that the Wright City's superintendent, school board and the coach submitted their requests for reconsideration, May 1, 2013, the school board sought injunctive relief in the district court to allow Wright City to participate in the first round of the tournament on May 2, 2013. The petition alleged that OSSAA's refusal to allow Wright City to participate in the state tournament was arbitrary and capricious and that OSSAA violated its own due process rules and procedures. The district court entered an ex parte temporary restraining order against OSSAA. The restraining order found that Wright City would be irreparably harmed on and after May 2, 2013, if the team is not allowed to participate in the state tournament and the harm cannot be repaired by money damages.

¶ 10 Also on May 1, 2013, the Executive Director responded to the request for reconsideration from the Superintendent of Wright City. The Executive Director acknowledged receipt of the letters seeking reconsideration and service of process in the suit for injunction. The Executive Director pointed out differences in the Sand Springs and Guthrie situations and the Wright City situation and claimed that Wright City's situation gave rise to a presumption that Wright City gained an unfair competitive advantage. He admonished Wright City for the coach's error, for seeking judicial relief, for misinforming the court, and for any disruptive delay of the tournament. He did not treat Wright City's requests for reconsideration as a request for a meeting with the investigator under OSSAA's Constitution, Article IV, Section 6(c) or an appeal to the OSSAA Board of Directors under Section 6(f).

¶ 11 At the hearing on the temporary injunction on May 3, 2013, the Executive Director testified extensively about the Guthrie and Sand Springs situations. In summary, he testified that in the Guthrie situation the coach for the varsity spring baseball team scheduled twenty-three games; Guthrie brought their junior varsity team to play the twenty-third game scheduled against El Reno and asked that it be counted as a junior varsity game; El Reno refused to count the game as a junior varsity game; Guthrie forfeited the game and was automatically placed on probation status; and Guthrie self-imposed penalties. The Executive Director determined that Guthrie did not exceed the game limit because they played their junior varsity team and moved Guthrie from probation status to warning status allowing Guthrie to play in the tournament.

¶ 12 The Executive Director testified that in the Sand Springs situation the coach realized they scheduled too many games; "so knowing that they went over on the game limitations it would be a forfeit and we would put them on probation, they would be out of the playoffs, so when they got to the end, when they go to 22 games, they forfeited their last district game." Tr., p. 26. Because of the forfeiture, Sands Springs was placed on probation and "they took the necessary steps in our opinion we allowed them to play in the play-offs." Tr., p. 27. "Based on the violation and based on the circumstances they provided to us, we decided to remove them from probation status to a warning status and to let them continue on with the baseball." Tr., p. 29.

¶ 13 The Executive Director testified he was dealing with a specific penalty for Sand Springs and Guthrie. Although he did not identify the specific regulation, it must have been the Spring Baseball Regulations for Class 5A and 6A which provides that a team will automatically be placed on probation when the team forfeits a game and that probation status prohibits the team from post-season contests. See, Spring Baseball Regulations IV(2). He testified there was no specific penalty rule for Wright City's violation and the penalty was left to his discretion to do nothing, to prohibit Wright City from playing in the state tournament, to suspend the coach, or other endless possibilities: (Tr., p. 40):

Q: Are there others that you would say are possibilities of punishment?

A: Possibilities are endless counselor.

Q: Cause it is completely in your discretion, isn't it?

A: We go back to the precedence that have been set in the past and we have several precedence that are identical to this situation and we applied the same sanctions here as we did with previous schools that have violated game limitations.

Q: But the rules that we discussed that Guthrie's baseball and Sand Springs baseball teams made, there were specific rules that you said you cannot continue to play if you do this, were there not?

A: Yes.

Q: But in this instance there is not a specific rule that says you cannot continue to play, that is just something in your discretion that ya'll decide, that is right isn't it?

A: Based on previous precedence, yes.

¶ 14 As to the previous forfeitures for rule violations, the Executive Director testified that where a football team plays an ineligible player, the contest is forfeited and the ineligible player sits out the same number of contests when he/she becomes eligible. Again, he did not identify the regulation that specifically prescribes the minimum penalty against the team for participation of an ineligible player to be forfeiture of all contests in which the ineligible player participated. See, Football Regulation XIII. The Executive Director testified he disagreed with the Board's decision to allow the Guthrie football team to play in the tournament without the ineligible player. Tr., p. 52.

¶ 15 The trial judge inquired of the Executive Director about his testimony that there cannot be a rule for punishment for violation of every rule in the book. Tr., p. 56. The Executive Director testified that there is no punishment in the OSSAA rules for violation of the game-limit rule. The Executive Director did not, however, inform the trial

judge of the general enforcement rule. OSSAA Board of Directors' Policies, No. I RULE ENFORCEMENT, enumerating penalties for violations of OSSAA rules.

¶ 16 At the conclusion of the evidentiary hearing, the trial judge granted a temporary injunction. The trial judge found that 1) Wright City would be irreparably harmed if the injunction is denied; 2) the forfeit would affect other teams regarding pitching; 3) all decisions presented by defendant involved matters in which there were specific penalties; 4) there is no penalty for Wright City's violation so OSSAA's decision in this matter is arbitrary; and 5) the rules do not provide for a general penalty. OSSAA appealed. We retained and expedited the appeal.

## II. Standard of Review

■ ¶ 17 The dispositive issue is whether the trial court's temporary injunction is a clear factual or legal error or an abuse of discretion. *Board of Regents v. National Collegiate Athletic Ass'n,* 1977 OK 17, 561 P.2d 499, 501. Pursuant to 12 O.S.2011, 952(b)(2), this Court may reverse, vacate or modify a district court's temporary injunction where, if on review, it appears from the nature of the case and all the facts properly before the court that the plaintiff was not entitled to an injunction and that it should not have been granted. *Id.,* at 501–502. Injunctive relief is equitable in nature and the appellate court will consider all the evidence on appeal. *Id.*

## III. OSSAA

¶ 18 OSSAA is an association of 481 secondary schools, Tr., p. 21, formed to conduct and supervise numerous competitive extracurricular student activities. Most public and private schools in Oklahoma are voluntary members of OSSAA.[1] The members of the OSSAA adopted a Constitution.[2] The

---

1. In its answer brief before this Court, Wright City argued the OSSAA must be treated as a public entity. The nature of the OSSAA was not challenged in the court below, and it is not fairly subsumed in the factual and legal issues dispositive of this appeal. We do not address the issue, and the OSSAA's motion to file a reply brief to present argument related to the nature of the OSSAA is hereby denied.

2. The OSSAA Constitution became effective November 1, 1962, and the organization was established January 1, 1963. The Constitution is seven pages in length and is divided into nine articles. Article IV, captioned ADMINISTRATION–BOARD OF DIRECTORS is nearly four pages in length. Article IV sets out the authority of and places constraints on the OSSAA

OSSAA, through its membership, has adopted Rules Governing Interscholastic Activities in Senior High Schools, a 32–page publication, and voluminous regulations governing the various competitive extracurricular student activities, including OSSAA's General Baseball Regulations and Spring Baseball Regulations. The OSSAA has adopted Board of Directors' Policies, a 28–page publication, authorized by its Constitution.

¶ 19 The OSSAA's power and duties are fixed by its Constitution. The OSSAA functions to serve secondary school students. It's mission statement in the Constitution, Article II, Section 2, reads:

> The OSSAA will serve member schools by providing leadership in the development, supervision, and conduct of co-curricular activities, which enrich the educational experiences of high school students. It will provide for equitable participation opportunities and positive recognition to students as a whole, while working cooperatively with schools to enhance the achievement of desired educational goals.

¶ 20 The OSSAA Board of Directors is authorized to adopt such policies and procedures necessary to conduct its business as long as the policies are not in conflict with the OSSAA Constitution and its rules, and to interpret the provisions of its constitution, rules, and policies and procedures, to investigate alleged violations, and to be the final judge as to whether a rule violation has occurred. OSSAA Constitution, Article IV, Section 4(b) and (g). The Board is also authorized to assess penalties and invoke sanctions for violation of its constitution, rules, and policies and procedures and its decisions are final. OSSAA Constitution, Article IV, Section 4(h). Section 4(h) also allows a member school to impose discipline for rule violations:

> ... the Board may assess a penalty against such school and school personnel

unless such school promptly elects to and does take disciplinary action against the guilty individual which is acceptable to the Board.

¶ 21 The OSSAA Constitution directs that the Executive Director or designee will conduct an impartial investigation of any alleged rule violation and authorizes the Executive Director to take temporary action to prevent further violation of the rules. OSSAA Constitution, Article IV, Section 6(a) and (d). It grants a school or individual the right to meet with the investigator prior to any decision on an alleged violation. OSSAA Constitution, Article IV, Section 6(c). It grants a school or individual the right to appeal to the Board of Directors, provides that any appeal will be heard at the next regularly scheduled board meeting, and requires the Executive Director to give notice to the school of the date, time and place of the appeal hearing. OSSAA Constitution, Article IV, Section 6(f). Except for the temporary action authorized in Section 6(d) of Article IV, the OSSAA Constitution does not authorize the Executive Director to assess penalties or invoke sanctions for violations of the constitution, rules, or policies and procedures.[3]

¶ 22 The OSSAA may enforce its published rules, regulations, and policies without undue interference by the courts. *Morgan v. Oklahoma Secondary School Activities Association*, 2009 OK 21, ¶ 17, 207 P.3d 362, 365. However, the courts will intervene to assure the OSSAA proceedings are conducted pursuant to its constitution, rules, regulations, and policies in good faith:

> We may not interject ourselves in the Association's internal affairs if the rules are reasonable, lawful, in keeping with public policy, and are interpreted fairly and reasonably and enforced uniformly and not arbitrary.

*Brown v. Oklahoma Secondary School Activities Association*, 2005 OK 88, ¶ 10, 125 P.3d

---

Board of Directors and the Executive Director, including the "DUE PROCESS–Procedures Regarding Investigations, Hearings and Appeals" in Section 6.

**3.** Section 2 of Article V of the Constitution allows the OSSAA to delegate the administration of OS-

SAA to the Executive Director but any policy or rule whereby the members or the Board of Directors may have attempted to delegate the power or to fashion penalties for rule violations to the Executive Director has not been brought to our attention.

1219, 1224. Although we leave its internal affairs to the OSSAA, this Court has recognized that the power to exercise discretion might be harmful to the OSSAA because the potential for arbitrary decisions comes with the power to exercise discretion. *Mahan v. Agee,* 1982 OK 116, ¶ 19, 652 P.2d 765, 768.

### IV. The Parties Arguments

¶ 23 In its brief in chief, OSSAA takes the position that the trial judge's temporary injunction is grounded in an erroneous proposition that enforcing a rule that has no specified penalty is inherently arbitrary. OSSAA contends that its constitution, rules, regulations, and policies do not provide a penalty for violation of the 22–game limit baseball rule and argues that disciplining a member for violating a rule that has no stated penalty is not inherently arbitrary. It is true that the trial judge ruled that there is no penalty for Wright City's violation so OSSAA's decision in this matter is arbitrary and that OSSAA's rules do not provide for a general penalty. These rulings are erroneous. However, these rulings are based upon the testimony of the Executive Director.

¶ 24 When the trial judge questioned the Executive Director about a penalty for violation of the game-limit rule, he testified there was no penalty provided in the rules. The Executive Director should have informed the trial judge of the written and published OSSAA Board of Directors' Policies and Policy No. I, captioned RULE ENFORCEMENT. Policy No. I prescribes three general penalties to be invoked or assessed for violations of OSSAA rules presented for a decision: 1) place a member school on warning status, 2) place a member school on probation status, and 3) suspend the school from membership. OSSAA's Constitution, Article IV, Section 4(h) limits the maximum penalty for any one violation of the Constitution or Rules to a one-year suspension. The trial judge erred and so did the Executive Director when he did not follow Policy No. I, which does not permit a future-game-forfeiture penalty for rule violations.

¶ 25 Without discussion, OSSAA asserts that the Wright City situation gave rise to a presumption that Wright City gained an un-fair competitive edge over the other seven teams in the eight-team state tournament. Factually, Wright City's five-inning play against a junior varsity team and a nine-member team does not give rise to a presumption of an unfair competitive edge. Further, neither the General Baseball Regulations prescribing the 22–game limit nor the Board of Directors' Policies recognizes a presumption of an unfair competitive edge. While a maximum on the number of season and tournament games levels the season's play time, it also, more importantly, assures that baseball will not invade and usurp the time needed for academics. We have carefully perused the OSSAA Constitution, Rules, Regulations, and Policies, and we do not find that the OSSAA membership or its Board of Directors recognize a presumption of an unfair competitive edge from a violation of the rules imposing game limitations.

¶ 26 OSSAA also argues that a forfeiture penalty for the 22–game limit rule is consistent with the rules requiring forfeiture of each contest in which an ineligible student participated. This argument is without merit. The rules and regulations include specific forfeiture penalties where ineligible players have participated in contests.

¶ 27 OSSAA also relies on the forfeiture penalties imposed on four softball teams in the fall of 2012. Both the Executive Director and his administrative assistant testified that such penalties were imposed without testifying to the factual similarities. The appellate record contains no evidence showing the particular situation of each of those softball teams. Even so, we have already determined that the Board of Directors' policies expressly enumerate the general penalties for rule enforcement. The general penalty provisions must be followed where no specific penalty has been adopted.

¶ 28 Wright City takes the position that the OSSAA seeks to punish Wright City for violation of a rule without a defined penalty and that OSSAA's reserving for itself total discretion to fashion an appropriate penalty is, on its face, arbitrary and capricious. Wright City argues that the OSSAA has not uniformly interpreted the terms "game" and "scrimmage" and "competition" and that it

has arbitrarily meted out ad hoc punishment for violation of the game-limit even accepting self-imposed penalty when it chooses. As discussed above, the published OSSAA Constitution, Rules, Regulations, and Policies required the Executive Director and the OSSA Board of Directors to enforce the 22–game limit rule within the confines of the rule enforcement policy in the Board of Directors' Policies.

## V. Conclusion

■ ¶ 29 The mission of OSSAA is to provide equitable participation opportunities to high school students, and the Executive Director has no authority to short circuit a student's participation opportunities. The Executive Director has the responsibility to impartially investigate alleged rule violations but he has no power to interpret the rules or to impose penalties in a manner that denies a school the right to meet with the investigator of an alleged rule violation or the right to a hearing before the Board of Directors as provided in the OSSAA Constitution. In this case, that is precisely what the Executive Director did. He decided against Wright City on the allegation of rule violation and imposed a future-game forfeiture which was outside the penalties allowed by OSSAA policies. Then in violation of the trial judge's ex parte temporary restraining order, he allowed the first day of state tournament playoffs with only seven teams to move forward. Further, the Executive Director did not treat Wright City's requests for reconsideration as either 1) a request for a meeting with the investigator prior to a decision on the allegation of a rule violation which he should have afforded even without a request before making a decision or 2) an appeal to the Board of Directors. The practical effect of the Executive Director's conduct is that the forfeiture penalty became permanent without compliance with the due process procedures prescribed in OSSAA's Constitution. We hold the Executive Director's decision that Wright City violated the 22–game rule and the forfeiture penalty are arbitrary and without force or effect.

¶ 30 The trial court had an obligatory duty to assure that Wright City was complaining of injury caused by the OSSAA Board of Directors' action. It erroneously did not. Courts review actions by the OSSAA members and Board of Directors. The decision on the issue of whether Wright City violated the 22–game rule must be made by the OSSAA Board of Directors. The controlling effect of reasonable OSSAA rules and the Board of Directors' reasonable interpretation of its rules and constitution has long been recognized by this Court.

¶ 31 Wright City's petition for injunctive relief complained that the OSSAA denied Wright City its right to due process, however neither party informed the trial judge that the OSSAA Board of Directors had not taken any action. Neither party nor the trial judge looked to the OSSAA Constitution to determine the propriety of the Executive Director's actions. Here, the OSSAA has acted only through the Executive Director. There is a complete absence of a showing that the OSSAA Board of Directors has been informed of the allegation made against Wright City, the penalty imposed against Wright City, or the request for reconsideration from Wright City.

■ ¶ 32 All the players in this controversy have erred: 1) the Executive Director should not have decided the alleged rule violation with Wright City's request for reconsideration pending and without allowing Wright City a meeting with the investigator, 2) Wright City should not have sought district court relief before the OSSAA Board of Directors denied it any relief, and, 3) the district court should not have entertained the petition for injunctive relief before it had proof that the OSSAA Board of Directors refused to rule on the alleged rule violation and refused to extend the baseball season to allow Wright City to exercise its rights under the due process procedure in the OSSAA Constitution. We emphasize that Wright City should not have gone to the district court before going to the OSSAA Board of Directors.

¶ 33 Accordingly, we dissolve the district court's temporary injunction and remand the cause to the district court with directions to stay this proceeding until Wright City has an opportunity to challenge the allegations of

rule violation before the OSSAA Board of Directors pursuant to OSSAA's Constitution, Article IV, Section 6. Rehearing in this appeal may be filed no later than Friday, June 7, 2013.

**DISTRICT COURT TEMPORARY INJUNCTION DISSOLVED; CAUSE REMANDED TO DISTRICT COURT WITH INSTRUCTIONS.**

COLBERT, C.J., and WATT, WINCHESTER, EDMONDSON, and TAYLOR, JJ., concur.

COMBS, J., (by separate writing)concurs specially.

KAUGER, J., (by separate writing) concurs in part and dissents in part.

REIF, V.C.J., (joins GURICH, J.) and GURICH, J. (by separate writing) dissent.

COMBS, J., concurring specially.

¶ 1 Although I concur in the majority opinion, I write to emphasize my view of the limitations of the Appeal process. Wright City will have an opportunity to challenge the penalty imposed by the Executive Director and to present mitigation for a lesser penalty to the Board of Directors.

¶ 2 The hearing before the Board must be with a level playing field. The Executive Director after having been challenged for his initial determination of punishment, chastised Wright City for "seeking judicial relief and for the disruptive delay of the tournament". The Board cannot comply with due process if the decision to punish is so firmly established to vitiate the fairness and impartiality of the appeal process. Punishing a "voluntary" member cannot be prejudged and an open opportunity to appeal must be afforded.

¶ 3 The majority opinion acknowledges there is no punishment in the OSSAA rules for violation of the game limit rule. The general punishment provisions relied upon however include only punishments to the

member school; i.e., place a member school on warning status, place a member school on probation, or suspend the school from membership (OSSAA Board of Directors' Policies and Policy No. 1, RULE ENFORCEMENT). None of the stated possible punishments deal with the individual responsible for breaking the rules, the coach. None of the stated possible punishments involve the forfeiture of games. In the precedent relied upon by the association, the specific rules provide for punishment against the offending coach or student, as well as the voluntary school member. Here the possibility exists an entire team of high school students are punished for a rule violation they have absolutely no control over. Where no specific penalty has been adopted, the general penalties for rules enforcement must be followed. Although the trial court was not advised of the general rules for punishment by the Executive Director, where the possible penalties do not include the very penalty imposed by the Executive Director the actions of the executive Director were arbitrary. In this proceeding the penalties available to the Board appear to be limited to warning, probation or suspension of the voluntary member school. No forfeiture provisions would apply. The Board would therefore not have any other possible penalty to impose.

¶ 4 The issue of a specific violation for the violation of the OSSAA General Baseball Regulations, Section VI(H) must be addressed, if at all, prospectively by an amendment to the Association rules or Constitution.

KAUGER, J., concurring in part, dissenting in part.

¶ 1 The issue presented is whether the trial court abused its discretion in granting a temporary injunction against the Oklahoma Secondary School Activities Association (the OSSAA) which has delayed the state Class A baseball championship and denied athletes the opportunity to play in it. Because, under the facts presented,[1] even if the OSSAA

---

1. Ordinarily, because the OSSAA is a voluntary association, we do not interfere with its internal decision making. However, our previous decisions did not involve such a blatant violation of internal due process procedures or such egre-

gious facts. Consequently, they are not dispositive here. For example, in *Brown v. Oklahoma Secondary School Activities Association,* 2005 OK 88, ¶ 10, 125 P.3d 1219, the student was directly involved in the dispute and the dispute involved a

Board of Directors determines a violation of the rules, its rules do not provide for forfeiture.

¶2 In *Apache Corporation v. State of Oklahoma ex rel. Oklahoma Tax Commission*, 2004 OK 48, 98 P.3d 1061, we explained why the procedure endorsed by the majority is partially flawed:

¶7 Exhaustion of administrative remedies is not required when those remedies are inadequate, ineffective or unavailable. *Dewey v. State ex rel. Oklahoma Firefighters Pension and Retirement System*, 2001 OK 40, ¶14, 28 P.3d 539, 546; *McCarthy v. Madigan*, 503 U.S. 140, 146–149, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992). We have explained the inadequacy, insufficiency, or futility of an administrative remedy when that remedy did not provide the parties with an opportunity to fairly present all claims and have them adjudicated. *Lone Star Helicopters, Inc. v. State*, 1990 OK 111, 800 P.2d 235, 237 (agency had no authority to adjudicate breach-of-contract claim); *Walker v. Group Health Services, Inc.*, 2001 OK 2, ¶39, 37 P.3d 749, 762 (Board could not award damages for bad faith breach of an insurance contract). *Cf. Montana National Bank of Billings v. Yellowstone County*, 276 U.S. 499, 505, 48 S.Ct. 331, 333, 72 L.Ed. 673 (1928), (taxpayer seeking refund was not required to exhaust where tax entity was powerless to grant any appropriate relief). . . .

¶9 We applied this exception to the exhaustion doctrine in *Bankoff v. Board of Adjustment of Wagoner County*, 1994 OK 58, 875 P.2d 1138, where we said that a

party was not required to seek a zoning variance when it had previously been denied a conditional use permit. We explained that **the law does not require one to do a vain or useless thing or to perform an unnecessary act to obtain relief.** *Id.* 1994 OK 58, at n. 9, 875 P.2d at 1143. *Cf. Orion Corp. v. State*, 103 Wash.2d 441, 693 P.2d 1369, 1379 (1985), (the futility exception to the exhaustion doctrine is premised upon the rationale that courts will not require vain and useless acts). (Emphasis supplied.)

¶3 It is a vain and useless act to send the matter back to the Board and to continue to stall the tournament. It is a waste of time, unreasonable, unfair and disruptive of the players' lives, to delay the state tournament when it can be immediately played and **later** determined: 1) if Wright City violated the rules against a 22 game limit when it participated in two five-inning post-season scrimmages; and 2) if so whether warning, probation or suspension is appropriate. The next Board meeting is June 4th and we are correctly reducing the normal rehearing to June 7th, the delay of the tournament continues and if rehearing is filed, it will be delayed even further.

¶4 The OSSAA Constitution Section 6 is a due process provision which requires an impartial investigation, written notifications, invitations to submit additional pertinent information to the investigation, as well as an opportunity for the schools, the students, and the student's parents to meet with the investigator.[2] The majority is correct that this

matter which occurred on the football field and witnessed by a referee. In *Mahan v. Agee*, 1982 OK 116, ¶2, 652 P.2d 765, the student had turned 19 and had exceeded the age limit eligibility requirement. In *Oklahoma Secondary School Activities Association v. Midget*, 1972 OK 154, ¶9, 505 P.2d 175, the OSSAA did not have a meeting as required by its Constitution but the Court determined it unnecessary because the principal of the high school which used the ineligible player gave initial information directly to secretary and neither the ineligible player nor his high school sought any relief.

2. The Oklahoma Secondary School Activities Association Constitution Section 6. DUE PROCESS–Procedures Regarding Investigations, Hearings, and Appeals provides in pertinent part:

a. The Executive Secretary or his/her designee (the "investigator") will conduct an impartial investigation into any alleged violation as soon as is reasonably possible after the allegation is brought to the attention of the Association. Before reaching any determinations, and as soon as is practical in the interest of insuring the investigation is complete, the representative of the member school(s) involved will be notified in writing, when feasible, of the alleged violation and invited to submit any information deemed pertinent to the investigation.

b. If the investigation may impact the eligibility of a student to participate in interscholastic activities or contests, or may result in the imposition of penalties or sanctions on individual school personnel, before reaching any determinations, the investigator shall direct the mem-

has not been completed and that an appeal to the OSSAA's Board of Directors has not yet happened. At this stage of the game, the trial court should have ordered the tournament to proceed and allow the process before the OSSAA Board to occur after the tournament in order not to punish other schools' student-athletes affected by the Executive Director's decision.

¶ 5 The OSSAA refers to itself as a "voluntary association responsible for regulating interscholastic competition between public and certain private secondary schools in Oklahoma." This Court has previously referred to the OSSAA as "voluntary." In *Brown v. Oklahoma Secondary School Activities Association,* 2005 OK 88, ¶ 10, 125 P.3d 1219, we described the OSSAA and its purpose, saying:

> The Association is made up of schools who voluntarily apply for membership. One of its purposes is to promote high standards of good sportsmanship. With member input, the Association adopts rules governing the interaction between the Association and the membership. Member schools are presumed to acquiesce in the rules and in the constitutional provision vesting final

authority as to whether a rule violation occurs in the Board of Directors.

¶ 6 While the term "voluntary" is used—for students—the term is a misnomer. A school is required be a member of the OSSAA to participate in state-wide interscholastic athletic events. Students who want to be involved in athletics and who might even choose athletics as a career are required to be bound by the OSSAA rules and procedures if their school is a member and if they want to play sports. In this sense, it is not truly "voluntary" as the term suggests.

¶ 7 Nevertheless, the general rule is that the courts should not intervene in the affairs of such associations, except to ascertain whether association proceedings are conducted pursuant to the rules and laws of the organization, in good faith and lawfully. Absent fraudulent, collusive, unreasonable, arbitrary or capricious behavior, this Court may not overturn a voluntary association's enforcement of its rules.[3] We may not interject ourselves in the OSSAA's internal affairs if the rules are reasonable, lawful, in keeping with public policy, and are interpreted fairly and reasonably and enforced uniformly and not arbitrarily.[4]

ber school's representative to notify the parents(s) or legal guardian of the student of the alleged violation or the school personnel involved, and to invite them to submit any information they deem pertinent to the investigation. The member school's representative shall provide the investigator with a written confirmation that his notice has been given within three days of the representative's receipt of notice of the alleged violation. If the investigator determines that the investigation my be compromised or impeded by immediate notice to the student or the student's parent(s) or legal guardian, or the school personnel involved, then notice may be delayed until the risk or interference with the investigation is minimized or eliminated.

c. Prior to reaching any determinations, the investigator shall further afford the school(s), as well as any students(s) involved and the student's parents or legal guardian of such student, the opportunity to request a meeting with the investigator. Any timely request will be granted.

d. Because some action my be necessary before an investigation of an alleged violation can be completed, the Executive Secretary is authorized to take temporary action pending further investigation and determination, if deemed necessary to prevent possible continuing or

repeated violations of the Associations's Constitution, Rules, or Policies or Procedures.

e. The Executive Secretary shall notify the representative of the member school(s) involved in writing of his/her decision with respect to the alleged violation as soon as possible after a determination has been made, and shall direct the representative to provide notice of the decision to any student(s) involved. The member school's representative shall provide the Executive Secretary with confirmation that this notice has been given within three days of receipt of notice of the Executive Secretary's decision.

f. A member school or individual aggrieved by a decision of the Executive Secretary shall each have the right to appeal to the Board of Directors of the Association....

3. *Brown v. Oklahoma Secondary School Activities Association,* 2005 OK 88, ¶ 10, 125 P.3d 1219; *Mahan v. Agee,* 1982 OK 116, ¶ 2, 652 P.2d 765; *Oklahoma Secondary School Activities Association v. Midget,* 1972 OK 154, ¶ 9, 505 P.2d 175.

4. *Brown v. Oklahoma Secondary School Activities Association,* see note 20, supra; *Mahan v. Agee,* see note 20, supra; *Board of Regents of the University of Oklahoma v. National Collegiate Athletic Association,* 1977 OK 17, ¶ 12, 561 P.2d 499, 85 A.L.R.3d 953; *Oklahoma Secondary School*

¶ 8 The standard of review imposed for the issuance of a temporary injunction is similar—whether the trial court abused its discretion or entered a decision against the evidence.[5] Pursuant to 12 O.S.2001 § 952(b)(2),[6] we may reverse, vacate, or modify a judgment of the district court where, on review, it appears from the nature of the case and all the facts properly before the Court the plaintiff was not entitled to injunctive relief.[7] Injunction proceedings are equitable in nature. Therefore, we consider all the evidence on appeal.[8]

¶ 9 While we have determined the Executive Director's actions were unreasonable and unlawful, there can be no determination concerning the OSSAA's actions because that process has not been completed. For some student-athletes playing in a state tournament is one of the highlights of their lives. They should not be haunted by "what might have been." The delay harms all the student-athletes, not just the players of Wright City. Because under any circumstances, the OSSAA's rules do not provide for forfeiture, I would allow the tournament to proceed with Wright City's participation and require the Board to proceed with the matter after the tournament. Any punishment or penalty is applicable to the school—not to the students. Here, the immediate answer is—Play Ball!

GURICH, J., with whom REIF, V.C.J. joins dissenting.

¶ 1 While I agree that in any future challenges to a decision made by the Executive

Director, an appeal should be taken to the OSSAA Board of Directors prior to seeking relief in district court, I dissent to the application of this procedure to this case. Without a doubt, the actions of the Executive Director were arbitrary, and his criticism of Wright City for seeking judicial relief is so compelling that a hearing before the Board cannot be fair or impartial under these circumstances. The trial court's decision was correct in all respects and should be affirmed.

5. *Brown v. Oklahoma Secondary School Activities Association,* see note 20 at ¶ 11, supra; *Sharp v. 251st St. Landfill, Inc.,* 1996 OK 109, ¶ 4, 925 P.2d 546; *State ex rel. Schulte v. Hallco Environmental, Inc.,* 1994 OK 138, ¶ 2, 886 P.2d 994; *Board of Regents of the University of Oklahoma v. National Collegiate Athletic Association,* see note 21, supra.

6. Title 12 O.S.2001 § 952(b)(2) provides in pertinent part:

(b) The Supreme Court may reverse, vacate or modify any of the following orders of the district court, or a judge thereof:

... 2. An order that discharges, vacates or modifies or refuses to vacate or modify a provi-

sional remedy which affects the substantial rights of a party; or grants, refuses, vacates, modifies or refuses to vacate or modify an injunction; grants or refuses a new trial; or vacates or refuses to vacate a final judgment; ...

7. *Brown v. Oklahoma Secondary School Activities Association,* see note 20 at ¶ 11, supra; *Board of Regents of the University of Oklahoma v. National Collegiate Athletic Association,* see note 21, supra; *Quaker Oil & Gas Co. v. Jane Oil & Gas Co.,* 1917 OK 192, ¶ 0, 164 P. 671.

8. *Brown v. Oklahoma Secondary School Activities Association,* see note 20 at ¶ 11, supra; *Board of Regents of the University of Oklahoma v. National Collegiate Athletic Association,* see note 21, supra; *Vickers v. Vining,* 1969 OK 66, ¶ 0, 452 P.2d 798.